558 P.2d 1048

J. H. NETTLETON, Plaintiff-Appellant,

v.

R. Keith HIGGINSON, as Director of the Dept. of Water Administration of the State of Idaho, Defendant-Respondent.

No. 11935.

Supreme Court of Idaho.

Jan. 12, 1977.

Herbert W. Rettig, of Dunlap, Rettig & Rosenberry, Caldwell, William F. Schroeder, of Schroeder, Denning & Hutchens, Vale, Ore., for plaintiff-appellant.

Nathan W. Higer, Legal Counsel, Boise, for defendant-respondent.

DONALDSON, Justice.

This controversy involves a dispute between plaintiff-appellant J. H. Nettleton, a water user located in the Upper Reynolds Creek Water District, and defendant-respondent Department of Water Resources, which assumes distribution of waters of Reynolds Creek. Reynolds Creek is a natural stream located in Owyhee County, Idaho, and the Department of Water Resources, formerly the Department of Water Administration, divided the stream into two water districts, District 57–A which is known as Upper Reynolds Creek District wherein the appellant owns property, and District 57–J which comprises Lower Reynolds Creek. The appellant's lands are located in Upper Reynolds Creek, and it is stipulated he has three types of water rights, adjudicated rights, licensed rights, and unadjudicated "constitutional" rights.

The respondent claims direction and control of the distribution of all of the waters of Reynolds Creek within the boundaries of Upper Reynolds and Lower Reynolds, and has ordered the watermaster for Upper Reynolds to distribute the waters in Upper Reynolds as if both Upper and Lower Reynolds were one water district. Consistent with that policy, respondent's position is that the decree of September 14, 1973, which adjudicated the rights of ten water users in Lower Reynolds, requires that the watermaster of Upper Reynolds recognize the priorities of those in Lower Reynolds in allocating the waters in his district.

The matter was submitted to the trial court upon stipulation of facts with the appellant seeking to enjoin the respondent from administering the distribution of waters from Reynolds Creek. The trial court granted respondent's motion for summary judgment, from which appellant now appeals.

Appellant assigns error to the lower court's failure to find the provisions of I.C. § 42–607 in violation of his constitutional rights.[1] His challenge is threefold: first, that the statutory preference for "adjudicated, decreed, permit, or licensed right[s]" over the so-called unadjudicated "constitutional use" water rights in times of water scarcity is a deprivation of property without due process (Idaho Const. Art. I, § 13; U.S. Const. Amend. XIV, § 1); second, that said statute is a denial of equal protection under the laws (U.S.Const. Amend. XIV, § 1; and

1. 42–607. Distribution of Water.—It shall be the duty of said watermaster to distribute the waters of the public stream, streams or water supply, comprising his water district, among the several ditches taking water therefrom according to the prior rights of each respectively, in whole or in part, and to shut and fasten, or cause to be shut or fastened, under the direction of the department of water resources, the headgates of the ditches heading from such stream, streams or water supply, when in times of scarcity of water it is necessary so to do in order to supply the prior rights of others in such stream or water supply; provided, that any person or corporation claiming the right to the use of the waters of the stream or water supply comprising a water district, but not owning or having the use of an adjudicated or decreed right therein, or right therein evidenced by permit or license issued by the department of water resources, shall, for the purposes of distribution during the scarcity of water, be held to have a right subsequent to any adjudicated, decreed, permit, or licensed right in such stream or water supply, and the watermaster shall close all headgates of ditches or other diversions having no adjudicated, decreed, permit or licensed right if necessary to supply adjudicated, decreed, permit, or licensed right in such stream or water supply. So long as a duly elected watermaster is charged with the administration of the waters within a water district, no water user within such district can adversely possess the right of any other water user."

finally, I.C. § 42–607 authorizes a taking of property for a public use without payment of just compensation (Idaho Const. Art. 1, § 14).

■ We first consider appellant's contention that the statute amounts to a deprivation of property without due process of law. We agree that individual water rights are real property rights which must be afforded the protection of due process of law before they may be taken by the state. Idaho Const. Art 15, § 4; *Anderson v. Cummings,* 81 Idaho 327, 340 P.2d 1111 (1959); *Follett v. Taylor Brothers,* 77 Idaho 416, 294 P.2d 1088 (1956).

■ The constitutional guarantee of procedural due process applies to governmental taking of legitimate property interests within the meaning of the Fifth or Fourteenth Amendments. It demands that if such a deprivation takes place, it must be accompanied by some type of notice and hearing. The United States Supreme Court, in *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), held that except in "extraordinary circumstances" where some valid governmental interest justifies the postponement of notice and hearing, due process requires an adversary proceeding before a person can be deprived of his property interest.

■ The appellant, however, in order to invoke the protection of the Due Process Clause, must have a "significant property interest" which is being deprived by the state's actions pursuant to I.C. § 42–607. *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The difficulty appellant has in this case is apparent. His claimed property interest is that of a "constitutional use" water right, such right being created simply by diverting unappropriated waters and putting those waters to beneficial use. I.C. § 42–103 et seq. Such a right, unless adjudicated, is an unproven

right, i. e. no formal proceeding, neither judicial nor administrative, has established said right. Until such a water right is adjudicated, the only evidence that the right exists are the declarations of the claimant himself. Even if upon investigation by the Water Resource Board or some interested person a means of diversion, as claimed by appellant, is discovered, there still remains the unanswered questions concerning the date such diversion of water was put into operation; the amount of water being diverted; the use for which the water is being diverted; and the continuity in time of appellant's diversion of water. Thus, this Court, in considering appellant's due process argument, faces the same problem[2] that the watermaster faces when attempting to distribute the waters in times of scarcity—i. e. determining which claimed "constitutional use" rights are valid and which are unwarranted and unjustified claims for water under the guise of a "constitutional use right."

■ But even if the appellant has sufficiently substantiated the existence of this claimed property interest so as to invoke the protections of the Due Process Clause, there are other reasons for rejection of this constitutional challenge.

Justice Powell, in a concurring opinion in *Mitchell v. W. T. Grant Company,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), notes that the determination of what due process is required in a given context requires a balancing of both the nature of the governmental function involved and the private interests affected. 416 U.S. at 624–25, 94 S.Ct. 1895. It is well-settled that the water itself is the property of the state, which has the duty to supervise the allotment of those waters with minimal waste to the private appropriators. I.C. § 42–101; *Poole v. Olaveson,* 82 Idaho 496, 356 P.2d 61 (1960); *Walbridge v. Robinson,* 22 Idaho 236, 125 P. 812 (1912). In addition, the state's authority to regulate the distribution of the water is constitutionally based:

**2.** While it is noted by the Court that both parties have stipulated, for the purposes of this case, that appellant owns a valid unadjudicated

constitutional use right, such stipulation is not proof of his property interest.

"The use of all waters now appropriated, or that may hereafter be appropriated for sale, rental or distribution; also of all water originally appropriated for private use, but which after such appropriation has heretofore been, or may hereafter be sold, rented, or distributed, is hereby declared to be a public use, and subject to the regulation and control of the state in the manner prescribed by law." Idaho Const. Art. 15, § 1.

The governmental function in enacting not only I.C. § 42–607, but the entire water distribution system under Title 42 of the Idaho Code is to further the state policy of securing the maximum use and benefit of its water resources. As to the private interests affected, it is obvious that in times of water shortage someone is not going to receive water. Under the appropriation system the right of priority is based on the date of one's appropriation, i. e. first in time is first in right. However, as stated earlier, it is the state's duty to supervise the distribution of the waters through the Water Resource Board and its watermasters. In *DeRousse v. Higginson*, 95 Idaho 173, 505 P.2d 321 (1973), the dissent aptly considered the practical difficulties facing the watermaster:

"It is to be kept in mind that the authority of the watermaster in his district is to control the delivery of the water from the source of supply * * * into the respective ditches or canals leading from the main stream. The watermaster is confronted by two significant problems when delivering water within his water district: first, he must maintain the constitutional requirement of priority of water rights among the various users; second, he is confronted with the practical problem of delivering water to the correct point of diversion. When one considers the magnitude of the watermaster's problem of water delivery in his

water district, it is evident that a proper delivery can only be effected when the watermaster is guided by some specific schedule or list of water users and their priorities, amounts, and points of diversion. * * *

"Only by having a specific list reciting the names of the water users, with their dates of priority, amounts, and points of diversion can such a system be administered. Since the so-called 'constitutional use right' is unrecorded in respect to priority, amount and point of diversion, the whole system of delivery in a water district would be endangered if such a right were recognized. * * *

" * * * All those individuals that enjoy the use of water by reason of having their rights adjudicated, or that have the use of water by reason of permits or licenses issued from the department of [water resources], are entitled to expect the state, which has granted them the right to the use of water, to protect them in their established rights.

"If [appellant's] interpretation [of the constitutionality] of I.C. § 42–607 is [followed], the validity of any decreed right or water permit or license would be placed in jeopardy. If anyone claimed a constitutional 'use right,' and took the water from the stream, the watermaster charged with the responsibility of administering the stream would be powerless to act. Consequently, a person enjoying a prior right established by a decree, permit or license, would be subject to losing his use of the water by anyone claiming a 'constitutional use right' without regard to its priority." 95 Idaho at 180, 181, 505 P.2d at 329.

The requirement of procedural due process is satisfied by the statutory scheme of Title 42 of the Idaho Code. Our holding is supported by a comparison of the state's duty as mandated by Article 15, § 1 of the Idaho Constitution with the appellant's ability, under I.C. § 42–1405,[3] to at any time

---

**3.** "42–1405. Summary supplemental adjudication of water rights.—Where the priority rights upon any stream, canal or reservoir in this state shall have been determined by decree of any court of competent jurisdiction, and thereafter it shall appear that any person or corpora-

tion having the right to the use of any part of said water was not included in said decree as a party thereto, and said right was not determined thereby, or that any person who subsequent thereto has acquired any right to the use of such waters, any such person or corporation

verify his "constitutional use right," thereby reaping the protective benefit of I.C. § 42–607 himself. Granted that when action is taken pursuant to I.C. § 42–607 there is no notice or hearing prior to the shutting off of the unadjudicated water rights, but as the United States Supreme Court noted in *Fuentes v. Shevin, supra,* there are extraordinary situations when postponement of notice and a hearing is justified. It is justified when:

> "First * * * the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in

the particular instance." 407 U.S. at 91, 92 S.Ct. at 2000.

We find the above three requirements to be met in the present case and find no procedural due process violation in the actions of the watermaster pursuant to I.C. § 42–607.

■ Appellant further contends that I.C. § 42–607 denies him equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution. He claims that the statute discriminates against constitutional use appropriators in an arbitrary and capricious manner.

The state has a legitimate purpose in enacting I.C. § 42–607, that purpose being to protect all private water rights in times of water shortage. Since the classes involved in I.C. § 42–607 are non-suspect, i. e. those with recorded water rights and those without, we need only find a rational relationship between the state's purpose and the enactment of the statute to uphold its

---

may have such right adjudicated in the following manner:

He may bring an action in the district court of the county wherein such decree was entered against the watermaster having charge of the distribution of the water of said stream, canal or reservoir in which said party claims an interest, or if there be no watermaster thereof, then against the department of reclamation; that the said party shall in his complaint, set out his own right as he is now required to do in cases involving the right of priority of use of water, and he shall further set forth his acceptance as binding upon him of the said decree and the findings of fact and conclusions of law upon which it is based. Thereupon summons shall issue out of said court in said cause and be served upon said defendant. The plaintiff in said action shall cause to be published once a week for not less than three weeks a notice of the pendency and purpose of said action in such newspaper or newspapers as the judge of said district court may order, which notice shall contain the title of the court and the cause, the name of the stream, canal or reservoir in the waters of which said plaintiff claims an interest, the date of priority claimed by him and the date and short title (being usually the name of the first plaintiff and the first defendant) of the decree theretofore entered, fixing the permanent rights in said stream, canal or reservoir. After the expiration of the time fixed by said order, said cause may be brought on for hearing in open court, and any party interested may appear and defend against said right. The court by its decree in said action

shall determine the rights of said plaintiff in accordance with the proof submitted but subject to the terms of the original decree hereinbefore referred to: provided, that the right thus established shall not be deemed adjudicated, but prima facie merely, and may be attacked by suit brought in a court of competent jurisdiction at any time by any person deeming himself aggrieved thereby. The court shall charge all costs arising under said action to the party bringing the same, unless the defendant personally shall be guilty of mismanagement or bad faith in the action or defense. Whereupon water shall be distributed to him in accordance therewith and in the same manner as though he had had his said right included in said decree. The plaintiff, any party to said original decree, or any person interested, may appeal from the decree entered in the action hereby authorized to be brought, and the statutes governing new trial and appeal and the procedure in connection therewith shall govern so far as applicable: provided, however, if the plaintiff appeals or moves for a new trial, notice thereof and of the date fixed for the settlement of any reporter's transcript, bill of exceptions, or any other matter required to be settled, shall be served by the publication of such notice or notices for three weeks in such newspaper as the judge of said district may by order direct. The proposed draft of such reporter's transcript, or other matter required to be settled, or bill of exceptions, shall be filed with the clerk of said court and such filing shall be sufficient service thereof. The transcript and briefs upon appeal shall be served as in other civil cases."

constitutionality. *State v. Cantrell*, 94 Idaho 653, 496 P.2d 276 (1972). Considering the problems of a "constitutional use" appropriation discussed earlier, the legislature and this Court recognize that we cannot adequately protect these rights unless the state's agent, the watermaster, has a specific record of the users' priority dates, use and points of diversion. We find that the legislative classification is rationally related to the state's purpose; and as it operates equally, uniformly and impartially on all persons within the same class, we find no denial of equal protection.

█ Appellant's final constitutional challenge is that I.C. § 42–607 would constitute a taking of private property for public use without just compensation contrary to Idaho Constitution, Article 1, § 14. We do not agree with this argument. The right of appropriation does not carry with it an unconditional guarantee of water regardless of the supply of water available. In times of shortage one holding an unadjudicated water right stands in a position similar to he who holds the "recorded" water right of the lowest priority date. The fact that his diversion must be shut off to allow those with an earlier priority to receive water cannot be complained of as being a violation of Article 1, § 14 of the Idaho Constitution.

█ Next, the appellant argues that the respondent had no authority to create water districts on Reynolds Creek. The parties have stipulated that no combination of decrees includes every constitutional-use right on Reynolds Creek. Under I.C. § 42–604 a water district cannot be created on streams whose "priorities of appropriation have not been adjudicated by the courts." It is appellant's contention that the statute requires every constitutional-use water right to be adjudicated before a water district can be created.

The stipulation fails to raise an issue of fact as to the validity of the creation of the water districts. Both Upper and Lower Reynolds Creek were originally created as one water district sometime prior to 1915.[4] The validity of the creation of that district depends upon the number of unadjudicated constitutional-use rights at that time, not at the present. Even assuming that there were some unadjudicated constitutional-use rights when the original district was formed, we do not construe I.C. § 42–604 as requiring that every such right must be adjudicated.

Although there is neither case law nor legislative history on this point, some legislative intent may be gleaned from the existence of I.C. §§ 42–607 and 42–1405. The first section authorizes the watermaster of a district to shut off the diversion of those having unadjudicated rights in times of water scarcity. The latter allows for supplemental adjudication proceedings against the district watermaster by one whose water rights were not adjudicated in an earlier proceeding. The existence of these two statutes shows that the legislature recognizes that a water district may be validly created even though not all users within said district have had their rights adjudicated.

We must presume that the district was validly created. Without evidence as to the number of unadjudicated constitutional-use rights in existence at that time, the appellant has failed to create any factual issue as to the validity of the district.

█ The original Reynolds Creek water district was split into two districts in April, 1916. Appellant contends that the creation of two districts on Reynolds Creek violated I.C. § 42–604. Under that statute a single stream may be divided into two or more water districts

"when the distance between the extreme points of diversion thereon is more than forty miles * * * provided, that any stream may be divided into two or more water districts, irrespective of the distance between the extreme points of diversion, where the use of the waters of

---

4. The official records of the Department of Water Resources, of which we take judicial notice, indicate that the original district was created prior to 1915, but they do not contain the exact date thereof.

such stream by appropriators in one district does not affect or conflict with the use of the waters of such stream by appropriators outside such district * *."

Appellant relies for this argument upon the parties' stipulation that the distance between the extreme points of diversion from the whole of Reynolds Creek has never exceeded forty miles. Appellant has presented no evidence, however, that in 1916 the use of the water by appropriators in one district affected or conflicted with the use by those in the other. The mere fact that there is a conflict almost sixty years later is not sufficient to show that there was a conflict in 1916.

■ Another of appellant's major assignments of error is that the Department of Water Resources has directed the watermaster for the Upper Reynolds District to distribute the waters within both Upper and Lower Reynolds District in accordance with priorities established by both the 1911 *Gifford* decree (Upper Reynolds ) and the 1973 *Benson* decree (Lower Reynolds). Appellant claims that since he was not a party to the action resulting in the 1973 decree he is not bound by it. To support his argument, appellant relies upon *Scott v. Nampa & Meridian Irr. Dist.*, 55 Idaho 672, 45 P.2d 1062 (1934).

The Court in *Scott* merely held that the consumers who were not parties to a prior action involving the canal company which supplied them with water were not bound by that decree in the sense of res judicata. They could therefore bring an action to determine their relative priorities to the water furnished by the canal company.

We fail to understand how the directive from the Department of Water Resources could be construed as having a res judicata effect on appellant's water rights. It in no way attempts to prohibit him from challenging the priorities established in the *Benson* decree. Whenever he desires, he may bring an appropriate action to do so. Until then both the *Benson* and *Gifford* decrees may be used by the state to provide a basis for the orderly distribution of irrigation water.

■ Subsequent to the district court decision in this case, the respondent issued an order combining into one water district the two districts involved herein. Under the facts of this case, we think that before such action can be taken creating one district the Department of Water Resources must first hold a public hearing, upon reasonable notice, wherein all interested persons may testify before the Department regarding facts relevant to the combined water district. There are approximately 68 decreed, licensed, and permit water rights on Reynolds Creek.[5] There is no indication as to the number of unadjudicated constitutional-use rights claimed on the Creek. There is also apparently some dispute as to whether the existing uses substantially conform to the claimed rights. As between the various Reynolds Creek water users, some of the water rights may have been lost by abandonment, *Sutton v. Brown*, 91 Idaho 396, 422 P.2d 63 (1966), or forfeiture, I.C. § 42–222(2); may have been transferred to other land which could have affected the return flow to Reynolds Creek, I.C. § 42–108, –202; or may have been acquired by adverse possession following five years of continuous adverse use, *Bachman v. Reynolds Irrigation Dist.*, 56 Idaho 507, 55 P.2d 1314 (1936). After receiving all of the claims and the evidence supporting said claims, the respondent must then decide whether there are sufficient uncontested rights to develop a workable plan for water distribution. If not, then the respondent should proceed with an adjudication pursuant to I.C. § 42–1406 before combining these two districts into one.

The judgment. is reversed and remanded to the district court to order such a hearing before the Department of Water Resources

---

5. The official records of the Department of Water Resources, of which we take judicial notice, list the decreed, licensed, and permit water rights, but do not contain information as to the unadjudicated constitutional-use water rights claimed in the district.

in accordance with this opinion. Costs to appellant.

McFADDEN, C. J., SHEPARD, J., and SCOGGIN, District Judge, retired, concur.

BAKES, Justice, concurring specially in part and dissenting in part:

I concur in the reversal of the summary judgment entered by the district court. However, since I believe summary judgment should have been directed for plaintiff appellant Nettleton, this separate analysis of the reasons for the reversal is necessary.

The plaintiff appellant's complaint seeking a declaratory judgment alleged that the respondent director's action, in attempting to administer Upper Reynolds Creek District 57–A and Lower Reynolds Creek District 57–J as though they were one district, was in violation of appellant's rights.

Appellant was a water user in Upper Reynolds Creek District 57–A. The primary reason alleged for asserting that the action of the director was unlawful was that before the director could treat Reynolds Creek as one irrigation district, I.C. § 42–604 requires that the priority of appropriations of Reynolds Creek must be "adjudicated" by a court having jurisdiction of the controversy and of the parties. Appellant alleged in his complaint before the district court and argues before this Court that the record discloses there was no such "adjudication" of Reynolds Creek, and therefore one of the critical requirements of I.C. § 42–604 for the administration of Reynolds Creek as a single irrigation district had not been met.

Secondly, appellant argued that insofar as I.C. § 42–607 authorizes the watermaster to shut off his undecreed constitutional use water right, which the parties have here stipulated that he had, in favor of decreed or licensed or permit rights, regardless of the priorities of his undecreed constitutional use water rights, that I.C. § 42–607 was unconstitutional.

In my view, the first issue is determinative of the appeal. However, in view of the extensive discussion of the constitutional issues by the majority opinion, some analysis of those issues is also necessary.

I

Regarding the first issue of whether the waters of Reynolds Creek have been "adjudicated", the parties entered into a written stipulation which sets out that the plaintiff was the owner of certain valid water rights in Reynolds Creek which consisted of licensed rights, adjudicated rights and "unadjudicated constitutional use rights." In addition, the parties stipulated to the following facts:

"(e) Copies of every final Order pertaining to any water of any part of said Stream are attached hereto. No final Order involves, nor does any combination of any final Orders involve, (1) every undecreed constitutional use right, adjudicated water right, or licensed rights to use waters of such stream, and/or (2) every parcel of land being irrigated with the use of waters of such stream.

"(f) The defendant acting through his agents and employees claims direction of the distribution of waters from said stream within the boundaries of Upper Reynolds, and has informed the plaintiff and has directed the said Water Master for Upper Reynolds that water of the district will be distributed to the plaintiff and other persons having water rights in Upper Reynolds as if both Upper Reynolds and Lower Reynolds were one district, and would distribute said waters in accordance with a certain Decree dated September 14, 1973, and referred to in paragraph (e) above. Further, that decreed, licensed and permit rights would receive water from said stream in preference to so-called constitutional or use rights existing with respect to said stream.

"(g) The parties to the action wherein the Judgment and Decree dated September 14, 1973 referred to above, *included none of the owners of lands with water rights to waters of such stream located in Upper Reynolds or their predecessors; and some, but not all, of those parties owning lands with water rights to waters*

*of such stream, or their predecessors, situated in Lower Reynolds."* Tr., pp. 11–12, emphasis added.

In order to determine whether or not Reynolds Creek has been sufficiently "adjudicated" within the meaning of I.C. § 42–604 in order to justify administering the entire stream as though it were a single water district, it is necessary to look at the three decrees which have adjudicated water rights upon Reynolds Creek.

The first decree—the Bernard Decree—was entered on December 1, 1899. That decree merely stated that the plaintiff, J. C. Bernard, had a right to divert a certain number of inches of water from Reynolds Creek which was prior to the right of thirteen of the fourteen named defendants in the action, but subsequent to the right of the fourteenth. The decree did not set forth a priority date for the appropriation, nor did it list the amount of the appropriation or the location of the use of the water of any of the parties except those of the plaintiff Bernard and the defendant whose right was prior to Bernard's, nor did it set any duty of water with regard to any of the claims.

Some of the requirements for an "adjudication" are set forth in *Marsters v. United States,* 236 F. 633 (CA 9, 1916), wherein the court held that an adjudication requires a court to determine both the priority dates and use and places of use of all of the appropriators, and that same principle was later recognized by this Court in *Owen v. Nampa & Meridian Irrig. Dist.,* 48 Idaho 680, 285 P. 464 (1930). It is also essential

for an adjudication that the duty of water be determined by the court. *Farmers' Cooperative Ditch Co. v. Riverside Irr. Dist., Ltd.,* 16 Idaho 525, 102 P. 481 (1909). Because it lacked many of these essential elements of a decree, the 1899 Bernard Decree could in no way form the basis for an "adjudication" of Reynolds Creek within the meaning of I.C. § 42–604.

The 1911 decree—the Gifford Decree—set forth the rights of eighteen individuals or partnerships to divert and use the waters of Upper Reynolds Creek for twenty-seven different appropriations of various amounts of water to various uses with priority dates ranging from 1864 to 1908. The record indicates that the Gifford Decree involved only water users on Upper Reynolds Creek, but the record does not indicate whether the 1911 Gifford Decree included all of the water users on Upper Reynolds Creek at the time that the decree was entered or the predecessors of all the present users on Upper Reynolds Creek. This decree was apparently the basis upon which the predecessor to the respondent director formed Water District 57–A on Upper Reynolds Creek. The decree fixed the duty of water regarding the various appropriations adjudicated by the decree.

The 1973 decree—the Benson Decree—set forth the rights of nine individuals or partnerships to eleven separate appropriations on Lower Reynolds Creek. These appropriators, according to the findings, have continuously appropriated a certain amount of water for agricultural purposes since the dates of their initial appropriation, which vary between 1879 and 1889.[1] The stipula-

1. The 1973 decree provides a good example of a decree which should not be binding upon someone who was not party to that decree because it contains a recitation of the acquisition of water rights which strains credulity. According to that decree, each of the parties whose water right was established in that decree "did appropriate and divert from the waters of Reynolds Creek" as of a date as early as May 21, 1879, or as late as December 24, 1889, a certain number of miner's inches of water, "and did appropriate the same for irrigation, domestic and stock purposes, and that since the date of appropriation, said water has been continually used to a beneficial use on [the land thereafter described]." The parties to

the 1973 decree do not claim to be the successors in interest to appropriators who acquired water rights before 1890, but claim to have acquired the rights themselves and to have continually applied the water to beneficial use since the acquisition of the rights. Unless the parties to this decree were all centenarians, it seems unlikely that they could substantiate these claims, particularly if they were claiming to have acquired water rights themselves thirty or forty years before they were born. It is a violation of due process to preclude someone in Nettleton's position from contesting claims such as these when he was not a party to the decree in which they were established. That does not mean that the parties to the 1973

tion of facts in the record specifically sets out that the Benson Decree does not include any of the owners of lands with water rights located on Upper Reynolds, and some but not all of those parties owning lands with water rights to waters situated in Lower Reynolds Creek. The Benson Decree, in setting out the claims of those water users in Lower Reynolds Creek who were parties to it, described the number of inches of water in the appropriation, the land to which the water right is appurtenant and the date of appropriation. The decree does not make any determination of the duty of water and, based upon the description of water rights and those land descriptions from which the appurtenant acreages can be calculated, the duty of water appears to vary from as little as .44 inches per acre to as much as 1.14 inches per acre.[2]

No person named in any of these three decrees was a party to all of the three decrees; indeed, it may well be that no one is a party to any two of them (this cannot be determined without further evidence establishing the identity of persons with the same surname). The stipulation of facts upon which the present matter was submitted to the trial court, and upon which this Court must review the decision of the trial court, see *Koron v. Myers*, 87 Idaho 567, 394 P.2d 634 (1964); *Arnett v. Throop*, 75 Idaho 331, 272 P.2d 308 (1954); cf. I.R. C.P. 16, states that none of the decrees alone, nor all of the decrees in combination, involve "(1) every undecreed constitutional use right, adjudicated water right, or licensed rights to use waters of such stream, and/or (2) every parcel of land being irrigated with the use of waters of such

stream." Thus, based upon the record which was before the district court, there was no way of knowing how many other decreed water rights, licensed or permit water rights, and constitutional use water rights there are on Reynolds Creek which were not the subject of any of the three decrees. Based upon that record, the district court erred in granting summary judgment for respondent because there was no factual basis upon which to support a finding that Reynolds Creek had been "adjudicated" within the meaning of I.C. § 42–604. In my opinion, the only legal conclusion which can be drawn from such a record is that there is no "adjudication" of Reynolds Creek justifying the administration of the stream as a single water district and that the trial court erred in not declaring that the director of the Department of Water Resources had no authority to impose the terms of the Benson Decree upon the users of water in the Upper Reynolds Creek Water District 57–A. This Court, in *Mays v. District Court*, 34 Idaho 200, 200 P. 115 (1921), has stated that such an attempt is prohibited in the following clear and unambiguous language:

"Except for that limited class of actions which are strictly *in rem*, a decree is not and cannot be made, conclusive, as to parties who are strangers to it. . . . The same principle applies to decrees rendered in proceedings to adjudicate rights to the use of water, they not being strictly *in rem*. . . . The contention that one's right can be affected by a decree to which he was a stranger is repugnant to a fundamental principle of our jurisprudence, that no one will be judged until he has had a hearing. The operation of this

decree could not establish that they held water rights with priorities as early as those recited in the decree; it only means that no one who was not a party to that decree should be bound by such a recitation of rights, particularly if it would have been impossible for the parties to the 1973 decree to have acquired their rights in the manner they claimed they did.

2. The latter appropriation would appear to be in violation of I.C. § 42–220 which limits the right to use more than one inch per acre (i. e.,

no more than one second foot of water for each 50 acres of land) "unless it can be shown to the satisfaction of the department . . . in granting such license, and to the court in making such decree, that a greater amount is necessary . . . ." I.C. § 42–220. There is no such finding in the Benson Decree, nor can we tell whether this is the only appropriation violating this statute because the acreage to which some of the water rights are appurtenant are not readily calculable from the land descriptions in the decree.

principle cannot be defeated by the mere fact that it will put other parties to some added trouble or expense." 34 Idaho at 207–208, 200 P. at 116.

In responding to the defendant respondent Higginson's motion for summary judgment, the district court in its memorandum opinion never discussed the appellant's primary argument that there had been no "adjudication" justifying the treatment of Reynolds Creek as one district, but decided the case on the issue of the constitutionality of I.C. § 42–604 and concluded that:

> "[I]t is immaterial whether there are in fact two water districts or one. The water involved comes from the same source and the watermaster of the Upper Reynolds Creek District 57–A must recognize and make allowance for priorities in District 57–J (Lower Reynolds Creek) that are adjudicated, decreed or otherwise legally determined of record." Tr., p. 33.

The district court's reasoning in granting summary judgment for the defendant respondent is directly in conflict with the rule set down by this Court in *Mays v. District Court, supra,* that "one's rights can[not] be affected by a decree to which he was a stranger . . . ." 34 Idaho at 207, 200 P. at 116.

The majority has reversed the judgment of the district court which granted summary judgment for the defendant respondent Higginson. However, I would go further than the majority and would direct the entry of summary judgment for the plaintiff appellant Nettleton because, based upon the record which was before the district court and the stipulated facts which are before this Court,[3] there has been no "adjudication" within the meaning of I.C. § 42–604 which would justify either treating water districts 57–A and 57–J as one water district, as was the issue before the district court, or the consolidation of them as the defendant respondent Higginson attempted to do by his order of December 2, 1975.

## II

The majority of the Court, having reversed the judgment of the district court granting summary judgment for respondent Higginson, in which I concur, has also passed upon several important constitutional issues and made certain comments disparaging the nature of constitutional use water rights, much of which was not necessary to decide this case and would better have been left unsaid. First, the Court goes to great lengths to point out the difficulty in determining the validity of constitutional use water rights and points out some of the practical problems which a watermaster faces in distributing water. These statements suggest, perhaps, that constitutional use water rights may not be a "significant property interest" even though a long line of this Court's prior opinions has ascribed to them the status of real property which is certainly a "significant property interest." *E. g., Olson v. Bedke,* 97 Idaho 825, 555 P.2d 156 (1976); *Anderson v. Cummings,* 81 Idaho 327, 340 P.2d 1111 (1959); *Beecher v. Cassia Creek Irr. Co.,* 66 Idaho 1, 154 P.2d 507 (1944); *Twin Falls Canal Co. v. Shippen,* 46 Idaho 787, 271 P. 578 (1928); *Bennett v. Twin Falls North Side Land & Water Co.,* 27 Idaho 643, 150 P. 336 (1915); *Nelson Bennett Co. v. Twin Falls Land & Water Co.,* 14 Idaho 5, 93 P. 789 (1908); *Ada County Farmers' Irr. Co. v. Farmers' Canal Co.,* 5 Idaho 793, 51 P. 990 (1898). *See also* I.C. § 55–101. The parties in this matter have stipulated that the appellant has valid, decreed, licensed and constitutional use water rights in Upper Reynolds Creek. I do not believe that it does the jurisprudence of this state any service to impugn constitutional use water rights when the record before this Court, by stipulation, establishes con-

---

3. I do not believe this Court should augment that record by taking judicial notice of factual materials from the records in the office of the director, for two reasons. First, we should review the trial court's actions based upon the record which was before it. Secondly, to take judicial notice of the records of one of the party litigants and use that against the other party is a questionable practice.

clusively the existence of such water right in the appellant.

Secondly, the conclusions which the majority draws from the recent trilogy of cases from the United States Supreme Court interpreting the due process requirements under the United States Constitution as it relates to governmental deprivation of property rights are, in my opinion, clearly in error. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing Inc. v. DiChem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). The majority states at page 1051, *ante,* that:

> "The United States Supreme Court, in *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), held that except in 'extraordinary circumstances' where some valid governmental interest justifies the postponement of notice and hearing, due process requires an adversary proceeding *before* a person can be deprived of his property interest." (Emphasis supplied).

In order to escape the obvious application of that rule to the actions of the watermaster under I.C. § 42–607, the majority opinion attempts to bring I.C. § 42–607 within the "extraordinary circumstances" exception to the *Fuentes* rule. I can find nothing in any of those United States Supreme Court cases to substantiate this position. The majority has selectively quoted from *Fuentes* to bolster its conclusion that this is an extraordinary situation. *Ante* at 1053. A fuller quotation from *Fuentes* shows that it contains no support for the majority's conclusion:

> "There are 'extraordinary situations' that justify postponing notice and opportunity for a hearing. . . . These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, *under the standards of narrowly drawn statute,* that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food.
>
> "The Florida and Pennsylvania prejudgment replevin statutes [being considered in this case] serve no such important governmental or general public interest. *They allow summary seizure of a person's possessions when no more than private gain is directly at stake.* The replevin of chattels, as in the present cases, may satisfy a debt or settle a score. But state intervention in a private dispute hardly compares to state action furthering a war effort or protecting the public health." 407 U.S. at 90–93, 92 S.Ct. at 1999–2000 (emphasis added, footnotes omitted).

In *Fuentes* the court was considering replevin laws authorizing repossession of goods upon the *ex parte* application of a person claiming a right to them and posting a security bond. The court said that repossession under those statutes without notice and a hearing was a deprivation of property without due process of law. The court contrasted the summary seizure under those statutes against summary seizures upheld in other decisions of the Supreme Court of the United States by noting that the statutes being considered in *Fuentes* authorized summary seizure "when no more than private gain [was] directly at stake" while in the other cases "important governmental or general public interest[s]" had been served by the summary seizure, such as seizures where the public health is threatened, or furthering the war effort, or seizure to collect the internal revenues. *Fuentes v. Shevin, supra.* No important governmental or general public interest is secured by

shutting the headgates of one appropriator with a valid constitutional use water right for the benefit of some other water user. Shutting the headgates in this circumstance does no more than determine whether the appropriator with a constitutional use right shall have the property (water) or some other appropriator; this is exactly what was involved in *Fuentes, Mitchell* and *North Georgia Finishing,* which also dealt with prejudgment seizures of property. The dispute in this case, as in those cases, is a dispute between private parties.

Neither has the majority explained why there is a special need for prompt action in this case—had such a dispute arisen on a stream which was not part of a water district, no comparable statute would come into play favoring one water user over another and providing that an officer of an official or quasi-official agency shall shut off one user for the other's benefit without notice and a hearing. Instead, litigation is allowed to run its course with the knowledge that if one user was wrongfully deprived of the right to water then he shall be entitled to damages against the other. Thus, I think it is clear that the case at bar does not involve an extraordinary situation within the meaning of the foregoing United States Supreme Court cases which justifies the postponement of notice and hearing, nor is it being decided under a "narrowly drawn statute" serving important governmental or general public purposes.

Moreover, as the Supreme Court of the United States explained in *Mitchell,* the fact that the officer who will make the decision to deprive the appropriator with a constitutional use water right of his right is an administrative officer rather than a judicial officer makes the procedure defective:

"[I]n *Fuentes v. Shevin,* . . . the constitutionality of the Florida and Pennsylvania replevin statutes was at issue. Those statutes permitted the secured installment seller to repossess the goods sold, without notice or hearing and without judicial order or supervision, but with the help of the sheriff operating under a writ issued by the court clerk at the

behest of the seller. *Because carried out without notice or opportunity for hearing and without judicial participation, this kind of seizure was held violative of the Due Process Clause. . . .*

"*The Florida law under examination in Fuentes authorized repossession of the sold goods without judicial order, approval, or participation.* A writ of replevin was employed, but it was issued by the court clerk. As the Florida law was perceived by this Court, '[t]here is no requirement that the applicant make a convincing showing before the seizure,' 407 U.S., at 73–74, 92 S.Ct., at 1991; the law required only 'the bare assertion of the party seeking the writ that he is entitled to one' as a condition to the clerk's issuance of the writ. *Id.,* at 74, 92 S.Ct., at 1991." 416 U.S. at 615, 94 S.Ct. at 1904. (Emphasis added).

Even if this issue were one of those "extraordinary situations" envisioned by the *Fuentes* decision "when postponement of notice and a hearing is justified," as the majority opinion concludes, *ante* at 1053, the statute, I.C. § 42–607, does not merely postpone the notice and hearing, but makes absolutely no provision for either notice or hearing. Therefore, assuming that the authority granted to the watermaster by I.C. § 42–607 were one of those "extraordinary situations", the failure of the statute to provide for even a postponed notice and hearing is a fatal defect.

The majority, however, argues that the supplemental adjudication procedure set forth in I.C. § 42–1405, *ante* at 1052–1053, footnote 3, adequately protects the appropriator's rights by giving him an opportunity to verify his constitutional use right. It is apparent that I.C. § 42–1405 does not provide for the expedited hearing discussed in *Mitchell* and *North Georgia Finishing,* but even if it did, the proceedings under that statute do not afford the appropriator with a constitutional use right the protection of an adjudication. The statute specifically provides that the water "right thus established shall not be deemed adjudicated, but prima facie merely

. . . ." Furthermore, assuming for the sake of argument that the legislature has authority to confer jurisdiction on the district court to conduct a proceeding which will not be binding upon the parties to the proceeding, nevertheless, I.C. § 42–1405 requires the party requesting a supplemental adjudication to accept " . . . as binding upon him . . . the said [prior] decree and the findings of fact and conclusions of law upon which it is based" even though he was not a party to that decree. This flies in the face of due process. *McKinney v. Alabama,* 424 U.S. 669, 96 S.Ct. 1189, 47 L.Ed.2d 387 (1976); *Reynolds Irrigation District v. Sproat,* 65 Idaho 617, 151 P.2d 773 (1944). To condition an appropriator's access to the court upon his acceptance of the findings of a decree to which he was not a party is a violation of due process of law in those circumstances where the party was not a successor in interest to a party to the decree or otherwise stands in relationship to some party to the prior decree so that binding him by that decree would not prejudice his rights. *E. g.,* in *Carrington v. Crandall,* 65 Idaho 525, at p. 533, 147 P.2d 1009, at p. 1012 (1944), the Court stated: "The [water] decree . . . will not be a bar to any person who is not a party or privy to this action." *See also McKinney v. Alabama, supra; Reynolds Irrigation District v. Sproat, supra; Scott v. Nampa & Meridian Irrig. Dist.,* 55 Idaho 672, 45 P.2d 1062 (1934); *Inman v. Round Valley Irrig. Co., Ltd.,* 41 Idaho 482, 238 P. 1018 (1925). As this Court said 55 years ago in the case of *Mays v. District Court,* 34 Idaho 200, 200 P. 115 (1921), in discussing I.C. § 42–1405, which was then codified as C.S. 7036:

"If the remedy provided by sec. 7036 were intended to be exclusive, the section would be clearly unconstitutional. No person may be deprived of his property without due process of law. Const., I, 13. Due process of law requires that one be heard before his rights are adjudged. Cooley's Const. Lim., p. 506. Except for that limited class of actions which are strictly *in rem,* a decree is not, and cannot be made, conclusive, as to parties who

are strangers to it. . . . The same principle applies to decrees rendered in proceedings to adjudicate rights to the use of water, they not being strictly *in rem.* . . . The contention that one's rights can be affected by a decree to which he was a stranger is repugnant to a fundamental principle of our jurisprudence, that no one will be judged until he has had a hearing. The operation of this principle cannot be defeated by the mere fact that it will put other parties to some added trouble or expense." 34 Idaho at 207–208, 200 P. at 116.

Fifty-five years ago this Court said that the procedures outlined in I.C. § 42–1405 would clearly be unconstitutional were they mandatory, but today the majority points to these same procedures as a means by which an appropriator may verify his constitutional use right and protect himself. If this is, as the majority suggests, the appropriator's only practical means of protecting his water right, then it is mandatory in a very practical sense, and I believe, as did the Court in *Mays,* that it is clearly unconstitutional.

Furthermore, even if the appropriator with a constitutional use water right initiates proceedings under I.C. § 42–1405, he has not, as the majority suggests, "thereby reap[ed] the protective benefits of I.C. § 42–607 himself." *Ante* at 1053. That is because the statute provides:

"The court by its decree in said action shall determine the rights of said plaintiff in accordance with the proof submitted but subject to the terms of the original decree hereinbefore referred to: provided, *that the right thus established shall not be deemed adjudicated, but prima facie merely, and may be attacked by suit brought in a court of competent jurisdiction at any time by any person deeming himself aggrieved thereby.*" (Emphasis added).

The "protection" that the majority suggests that I.C. § 42–1405 gives to an appropriator who initiates proceedings under that section is no protection at all. Not only must he accept every right decreed in a proceeding to which he was not a party, but the

**102**

"rights" which he obtains from I.C. § 42-1405 are not an "adjudication" and may be attacked at any time by any person deeming himself aggrieved.

### III

In view of the fact that the judgment of the district court has been reversed and the cause remanded to the director for further hearings, I agree with the statements which the Court makes on p. 1055, *ante,* indicating some of the things that the director should consider in determining whether Reynolds Creek can be consolidated into, or operated as one water district. When the director conducts those hearings upon remand, it should become evident to him that the three decrees do not constitute an adjudication because they do not list all or substantially all of the present appropriators from Reynolds Creek, nor do they catalog all or substantially all of the present appropriations of water from Reynolds Creek. It is my belief that when the director conducts the hearing upon remand it will become apparent to him that the 1899, 1911 and 1973 decrees are not useful tools for the management and distribution of the waters of Reynolds Creek in 1976, because of possible changes in water rights since the times the decrees were entered due to adverse possession, abandonment, forfeiture, problems of return flow, transfer of rights to different parcels of land, and additional acquisition of constitutional use rights and, most importantly, the fact that there are too many appropriators not party to each decree who are not bound by its terms under our decisions in *Carrington v. Crandall, supra,* and *Mays v. District Court, supra.* Thus, I believe the only reasonable result which can come from such a hearing will be a determination that there is a need for a general adjudication of Reynolds Creek pursuant to I.C. §§ 42–1406 *et seq.,* as suggested by the majority, and in which I heartily concur.