# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37308-2010

| | | |
|---|---|---|
| CLEAR SPRINGS FOODS, INC., and BLUE LAKES TROUT FARM, INC., | ) ) ) | Jerome, December 2010 Term |
| Petitioners/Cross-Appellants, | ) ) | 2011 Opinion No. 32 |
| v. | ) ) | Filed: March 17, 2011 |
| GARY SPACKMAN, in his capacity as Director of the Idaho Department of Water Resources, and the IDAHO DEPARTMENT OF WATER RESCOURCES, | ) ) ) ) ) | Stephen W. Kenyon, Clerk |
| Respondents, | ) ) | |
| and | ) ) | |
| IDAHO GROUND WATER APPROPRIATORS, INC.; NORTH SNAKE GROUND WATER DISTRICT; and MAGIC VALLEY GROUND WATER DISTRICT, | ) ) ) ) ) | |
| Cross-Petitioners/Appellants, | ) ) | |
| and | ) ) | |
| IDAHO DAIRYMEN'S ASSOCIATION, INC., and RANGEN, INC., | ) ) ) | |
| Intervenors. | ) ) | |

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, in and for Gooding County. The Hon. John M. Melanson, District Judge.

The judgment of the district court is <u>affirmed</u>.

Racine Olson Nye Budge & Bailey, Pocatello, for appellants. Thomas J. Budge argued.

Barker Rosholt & Simpson, LLP, Twin Falls, for cross-appellant Clear Springs Foods, Inc. John K. Simpson argued.

Ringert Law, Chartered, Twin Falls, for cross-appellant Blue Lakes Trout Farm, Inc. Daniel V. Steenson argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondents. Christopher M. Bromley argued.

_____

EISMANN, Chief Justice.

This is an appeal from a decision on judicial review upholding curtailment orders issued against junior groundwater users because their withdrawals of water from the aquifer were causing material injury to senior appropriators' surface water rights. The senior appropriators also cross-appeal the failure to curtail additional groundwater pumping. We affirm the judgment of the district court.

## I. FACTS AND PROCEDURAL HISTORY

The Snake River rises in western Wyoming, flows westward across the entire breadth of Idaho, turns northward forming Idaho's western boundary, and ultimately empties into the Columbia River. It is the largest and longest tributary of the Columbia River. As it crosses southern Idaho, it courses through the Snake River plain, a prominent depression extending about 400 miles in an east-west direction and ranging from 50 to 125 miles in width. Underlying the eastern portion of the plain is the Eastern Snake River Plain Aquifer (Aquifer), which is about 170 miles long and 60 miles wide. It is estimated that it contains up to a billion acre feet of water, which would be roughly the amount of water contained in Lake Erie.

Clear Springs Foods, Inc., (Clear Springs) and Blue Lakes Trout Farm, Inc., (Blue Lakes) (collectively called "Spring Users") are both engaged in fish farming. They each have water rights in certain springs emanating from the canyon wall along a section of the Snake River below Milner Dam in south central Idaho. Those springs are fed by the Aquifer. Members of the Idaho Ground Water Appropriators, Inc., the North Snake Ground Water District, and the Magic Valley Ground Water District (collectively called "Groundwater Users") have ground water rights entitling them to pump water from wells drilled into the Aquifer.

The Aquifer is predominately fractured Quaternary basalt having an aggregate thickness that, in some locations, may exceed several thousand feet. It decreases to shallow depths in the

area where the springs emanate. The fractured basalt is characterized by high hydraulic conductivities that are typically 1,000 feet per day, but they range from 0.1 to 100,000 feet per day.

The ground water in the Aquifer is hydraulically connected to the Snake River and tributary surface waters at various places and in varying degrees. As a result, ground water can become surface water, and surface water can become ground water. The amount that becomes one or the other is largely dependent upon ground water elevations. When water is pumped from a well, it causes a cone-shaped lowering of the ground water elevation near the well. Surrounding ground water then flows into the cone from all sides, depleting ground water away from the well. When that occurs in an area hydraulically connected to a reach of the river or its tributaries, it results in a loss of water from the river or a loss of gain to the river.

Beginning in the 1950's, groundwater appropriations from the Aquifer increased dramatically. It now receives about 7.5 million acre-feet of recharge on an average annual basis and discharges about the same amount of water, with nearly 2.0 million acre-feet annually of that discharge in the form of depletions from ground water withdrawals. About 95% of the ground water diverted from the Aquifer is used for irrigation. The remainder is used for public, domestic, industrial, and livestock purposes.

After about two decades of increased groundwater pumping, the resulting decrease in river flow caused the Idaho Power Company to commence litigation against the State and various water users regarding its water rights at the Swan Falls Dam. *Idaho Power Co. v. State, By and Through Dept. of Water Resources*, 104 Idaho 575, 661 P.2d 741 (1983). It sought a determination of the validity of those water rights and a ruling that they were not subject to future upstream depletion. *Id*. at 578, 661 P.2d at 744. That dam was the first hydroelectric dam on the Snake River and is located in southwestern Idaho near Murphy, the county seat of Owyhee County. It had been constructed in 1901 by the Trade Dollar Consolidated Mining Company to provide electrical power to the mines in the area of Silver City, *id*. at 578, 661 P.2d at 744, which was then the county seat. In 1915, that company and four other electric power suppliers merged to form the Idaho Power Company. *Id*. In that merger, Idaho Power acquired the Swan Falls Dam and power plant. *Id*. Because of the diminished river flow, an Idaho Power ratepayer had filed a complaint with the Idaho Public Utilities Commission alleging that he and other ratepayers were being overcharged because Idaho Power had failed to preserve its power

generation water rights at Swan Falls. *Id*. at 582, 661 P.2d at 748. After Idaho Power's motion to dismiss for lack of jurisdiction had been denied, it answered indicating that it would file an action to protect its Swan Falls water rights, which it did. *Id*.

One of the issues in that case involved a subordination clause in the federal license issued to Idaho Power in 1955 for its Hells Canyon project. In the 1950's, Idaho Power had desired to construct three dams in Hells Canyon, which is North America's deepest river gorge. To obtain political support for that project, it proposed that its federal license include a clause subordinating its water rights to future upstream depletion. *Id*. at 580, 661 P.2d at 746. Consistent with that request, the federal license for the three dams contained a subordination clause with no conditions attached. *Id*. at 581, 661 P.2d at 747. In Idaho Power's litigation to determine its water rights at Swan Falls, the district court held that the subordination clause in the federal license for the Hells Canyon project applied to all of Idaho Power's water rights used in hydropower production at all of its facilities on the entire Snake River watershed, including the one at Swan Falls. *Id*. at 583, 661 P.2d at 749. On appeal, this Court reversed that holding, *id*. at 586, 661 P.2d at 752, and remanded the case for consideration of affirmative defenses raised by the defendants, *id*. at 590, 661 P.2d at 756. "Idaho Power responded by filing a second lawsuit naming as defendants the State of Idaho and approximately 7500 persons claiming water rights in the Snake River basin." *In re Snake River Basin Water System*, 115 Idaho 1, 3, 764 P.2d 78, 80 (1988).

Idaho Power had secured a federal court decree which, together with state water licenses, granted it water rights at Swan Falls of 9,450 c.f.s. with priority dates ranging from 1900 to 1919. *Idaho Power Co. v. Dept. of Water Resources,* 104 Idaho at 578, 661 P.2d at 744. It was undisputed that the power plant's capacity was 8,400 c.f.s., which would be the limit of its water rights. *Id*. In order to resolve the lawsuits, Idaho Power and the State entered into the Swan Falls Agreement executed on October 25, 1984. In that agreement, Idaho Power agreed, among other things, to "an unsubordinated right of 3900 c.f.s. average daily flow from April 1 to October 31, and 5600 c.f.s. average daily flow from November 1 to March 31, both to be measured at the Murphy U.S.G.S. gauging station immediately below Swan Falls." Pursuant to the agreement, those flows are not subject to depletion. The State agreed, among other things, to propose and support legislation providing funding for a general adjudication of the Snake River Basin.

4

In response, the legislature enacted legislation to commence an adjudication of the water rights of the Snake River basin. Ch. 18, § 1, 1985 Idaho Sess. Laws 27, 28. The legislation stated, "Effective management in the public interest of the waters of the Snake River basin requires that a comprehensive determination of the nature, extent and priority of the rights of all users of surface and ground water from the system be determined." *Id.* On June 17, 1987, R. Keith Higginson, as Director of the Idaho Department of Water Resources (Department), filed a petition in the name of the State to begin the Snake River Basin Adjudication (SRBA), and on November 19, 1987, the court ordered that the adjudication was commenced.

In 1994, an interim legislative committee charged with reviewing the progress of the SRBA issued a committee report in which it stated, "Historically, conjunctive management has not occurred in Idaho, especially between the Snake River Plain Aquifer and the Snake River. To conjunctively manage these water sources a good understanding of both the hydrological relationship and legal relationship between ground and surface water rights is necessary." *A & B Irrigation Dist. v. Idaho Conservation League*, 131 Idaho 411, 422, 958 P.2d 568, 579 (1997). The committee also "noted the pendency of studies on conjunctive management investigating the effect of ground water pumping on natural springs that flowed directly into the Snake River."[1] *Id.* With respect to the SRBA, the committee stated that the adjudication was commenced "in large part to resolve the legal relationship between the rights of the ground water pumpers on the Snake River Plain and the rights of Idaho Power at its Swan Falls Dam." *Id.*

In 1994, the Department adopted rules concerning conjunctive management of ground water and surface water for the entire state. IDAPA 37.03.11.000 to 37.03.11.050. The Department has also developed a calibrated ground water model to determine the effects on the Aquifer and hydraulically-connected reaches of the Snake River and its tributaries from pumping a single well in the Aquifer, from pumping selected groups of wells, and from surface water uses

---

[1] In *A & B Irrigation District v. Idaho Conservation League*, 131 Idaho 411, 422, 958 P.2d 568, 579 (1997), we stated with respect to conjunctive management:

> Conjunctive management combines legal and hydrologic aspects of the diversion and use of water under water rights arising both from surface and from ground water sources. Proper management in this system requires knowledge by the IDWR of the relative priorities of the ground and surface water rights, how the various ground and surface water sources are interconnected, and how, when, where and to what extent the diversion and use of water from one source impacts the water flows in that source and other sources.

on lands above the Aquifer. In 2004, the Department, working in collaboration with other entities, completed reformulation of that model.

On March 22, 2005, Blue Lakes delivered a letter to the Department demanding that then-Director Karl J. Dreher require the local watermaster to administer water rights as required by Idaho Code § 42-607 in order to supply Blue Lakes with water under its senior rights. On May 2, 2005, Clear Springs delivered letters to the Director making a similar demand. The Director considered the letters to be delivery calls. Without holding a hearing, on May 19, 2005, he issued findings of fact, conclusions of law, and an order requiring curtailment of specific groundwater users with water rights junior to those of Blue Lakes. On July 8, 2005, he issued a similar order with respect to specific groundwater users with rights junior to those of Clear Springs. Several entities, including the Groundwater Users, moved to intervene, and both they and the Spring Users moved for reconsideration and a hearing.

On August 1, 2007, then-Director David R. Tuthill, Jr., appointed a hearing officer to preside over an evidentiary hearing regarding the Spring Users' delivery calls. The hearing began on November 28, 2007, and continued for about twelve days. On January 11, 2008, the hearing officer issued his findings of fact, conclusions of law, and recommendation. After considering objections submitted by the parties, the Director issued a final order on July 11, 2008. Except as modified in the final order, he adopted the former Director's findings of fact and conclusions of law, the hearing officer's recommendations, and the curtailment orders.

Clear Springs filed a petition for judicial review, and Blue Lakes and the Groundwater Users filed cross petitions for judicial review. The district court affirmed most of the final order. The parties moved for reconsideration, and the district court made one modification and issued its final decision. The Groundwater Users appealed, and the Spring Users cross appealed.

## II. ISSUES ON APPEAL
### Issues Raised by Groundwater Users
A. Did the district court err in holding that the curtailment orders do not violate the Swan Falls Agreement?

B. Did the district court err in holding that the curtailment orders do not violate the full economic development provision of Idaho Code § 42-226?

6

C. Did the district court err in upholding the Director's determination that the ground water depletions caused material injury to the Spring Users' water rights?

D. Did the district court err in upholding the Director's determination that the Spring Users' delivery calls were not futile?

E. Did the district court err in upholding the Director's findings based upon the ground water model?

F. Did the district court err in failing to set aside the curtailment orders because the Director did not give the Groundwater Users a hearing before issuing the curtailment orders?

## Issues Raised by Spring Users

G. Did the district court err in failing to order the Director to curtail more ground water pumping?

## III. ANALYSIS

When reviewing agency action on a petition for judicial review, the district court must affirm the agency unless it finds that the agency's findings, inferences, conclusions, or decisions are: "(a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) not supported by substantial evidence on the record as a whole; or (e) arbitrary, capricious, or an abuse of discretion." Idaho Code § 67-5279(3). "Review on appeal is limited to those issues raised before the administrative tribunal," *Johnson v. Blaine County*, 146 Idaho 916, 920, 204 P.3d 1127, 1131 (2009), with the exception of "an issue the administrative tribunal lacked the authority to decide," *id*. at n.2. The district court cannot substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Idaho Code § 67-5279(1). On an appeal from the district court, we review the decision of the district court to determine whether it correctly decided the issues presented to it. *Wright v. Board of Psychological Examiners*, 148 Idaho 542, 544-45, 224 P.2d 1131, 1133-34 (2010). "This Court will not consider issues that were not raised before the district court even if those issues had been raised in the administrative proceeding." *Marcia T. Turner, L.L.C. v. City of Twin Falls*, 144 Idaho 203, 208, 159 P.3d 840, 845 (2007).

**A. Did the District Court Err in Holding that the Director Did Not Fail to Administer the Aquifer in Accordance with the Comprehensive Plan Established by the Swan Falls Agreement?**

In 1984, the State of Idaho and the Idaho Power Company entered into an agreement to resolve litigation regarding Idaho Power's water rights for hydropower generation at its Swan Falls plant. Idaho Power agreed to subordinate its rights from 8,400 c.f.s. down to an average daily flow (measured at the Murphy gauging station) of 3,900 c.f.s. from April 1 to October 31 and 5,600 c.f.s. from November 1 to March 31. "The purpose of the agreement concerning subordination was to make available more water for future appropriators and to assist in the expansion of other beneficial uses of the water in the Snake River." *Miles v. Idaho Power Co.*, 116 Idaho 635, 637, 778 P.2d 757, 759 (1989).

On October 9, 2007, the Groundwater Users moved for a partial summary judgment in the agency proceedings. One of the issues they asserted was, "Appropriators of spring waters in the Thousand Springs region are precluded from making a delivery call against appropriators of ground water from the East Snake Plain Aquifer so long as minimum Snake River flows are maintained at the Murphy Gauge in accordance with the Swan Falls Agreement." The hearing officer rejected that argument on the grounds that the Spring Users were not parties to the Swan Falls Agreement and the Agreement does not expressly address the issue. The Groundwater Users filed objections to that ruling with the Director, who considered but rejected them.

In the district court proceedings, the Groundwater Users asserted that the Director's curtailment orders violated the obligation to manage the Aquifer in accordance with the minimum flows prescribed by the Swan Falls Agreement. The district court rejected that argument on the ground that the Agreement did not establish minimum flows for specific sub-reaches of the Snake River or spring complexes. "Where the lower court reaches the correct result by an erroneous theory, this Court will affirm the order on the correct theory." *Nampa & Meridian Irr. Dist. v. Mussell*, 139 Idaho 28, 33, 72 P.3d 868, 873 (2003).

By the Swan Falls Agreement, the Idaho Power Company agreed to the subordination of part of its water rights for generating hydroelectric power at the Swan Falls Dam to "subsequent beneficial upstream uses upon approval of such uses by the State in accordance with State law unless the depletion violates or will violate [the unsubordinated rights set forth in the Agreement]." There is nothing in the Agreement indicating that the State purported to

8

subordinate any third party's surface water rights to junior ground water rights. Indeed, the State could not have done so without paying just compensation to the owners of the senior water rights. "In Idaho, water rights are real property." *Olson v. Idaho Dept. of Water Resources*, 105 Idaho 98, 101, 666 P.2d 188, 191 (1983); Idaho Code § 55-101. "When one has legally acquired a water right, he has a property right therein that cannot be taken from him for public or private use except by due process of law and upon just compensation being paid therefor." *Bennett v. Twin Falls North Side Land & Water Co.*, 27 Idaho 643, 651, 150 P. 336, 339 (1915). "Priority in time is an essential part of western water law and to diminish one's priority works an undeniable injury to that water right holder." *Jenkins v. State, Dept. of Water Resources*, 103 Idaho 384, 388, 647 P.2d 1256, 1260 (1982). When there is insufficient water to satisfy both the senior appropriator's and the junior appropriator's water rights, giving the junior appropriator a preference to the use of the water constitutes a taking for which compensation must be paid. *Montpelier Milling Co. v. City of Montpelier*, 19 Idaho 212, 219, 113 P. 741, 743 (1911); Idaho Const. Art. XV, § 3. Thus, the Swan Falls Agreement could not have subordinated the Spring Users' water rights to other appropriators unless the Spring Users had been paid just compensation for such taking.

The Groundwater Users assert that the Agreement "protects all water rights with a priority date prior to October 1, 1984." That is not accurate. Idaho Power subordinated its water rights at the Swan Falls Dam "to those persons who have beneficially used water prior to October 1, 1984, and who have filed an application or claim for said use by June 30, 1985." Although Idaho Power subordinated its water rights to such persons, there is no wording in the Agreement purporting to subordinate any other appropriator's water rights to them. Likewise, there is nothing in the Agreement stating that an appropriator with a priority date before October 1, 1984, would never be subject to a delivery call from an appropriator with a senior water right.

The Groundwater Users also state: "[T]he Agreement required that the minimum flow at Murphy Gauge be increased by 600 cfs, from 3,300 cfs to 3,900 cfs. This secured a greater water supply for Idaho Power as well as spring users in the Thousand Springs area." Again, this is inaccurate.

In 1964, Article XV, § 7, was added to the Idaho Constitution. *Idaho Water Resource Bd. v. Kramer*, 97 Idaho 535, 541, 548 P.2d 35, 41 (1976). That amendment provided, "There shall be constituted a Water Resource Agency, composed as the Legislature may now or

9

hereafter prescribe, which shall have power to formulate and implement a state water plan for optimum development of water resources in the public interest . . . ." Pursuant to that amendment, the legislature created the Idaho Water Resource Board as the Water Resource Agency. Idaho Code §§ 42-1732 & 42-1734(1).

In 1976, the Idaho Water Resource Board adopted a State Water Plan which established minimum flows at three points along the Snake River. Idaho Water Resource Bd., The State Water Plan – Part Two 116 (1976). "A flow of 3300 cfs on the Snake River at the Murphy gaging station was established." *Idaho Power Co. v. State, Dept. of Water Resources*, 104 Idaho 575, 590, 661 P.2d 741, 756 (1983).[2] The State Water Plan did not reduce Idaho Power's water rights at Swan Falls to 3,300 c.f.s. As we held: "There is no requirement contained therein that the Snake River be depleted to 3300 cfs at Swan Falls . . . . Since we have held that Idaho Power's water rights at Swan Falls are vested, the State Water Plan is not to be construed as affecting those water rights." *Id*. Thus, because Idaho Power's water rights had not been not reduced to 3,300 c.f.s. by the State Water Plan, the Swan Falls Agreement did not increase them to 3,900 c.f.s. In actuality, "the agreement provided for the subordination of certain water rights claimed by Idaho Power to those of subsequent upstream users," *Miles v. Idaho Power Co.*, 116 Idaho 635, 636, 778 P.2d 757, 758 (1989), thereby reducing, not increasing, the amount of water that Idaho Power was entitled to have at its Swan Falls Dam.

Quoting from a portion of the Swan Falls Agreement, the Groundwater Users argue that it "initiated the Snake River Basin Adjudication (SRBA) and defined 'a sound comprehensive plan for the management of the Snake River watershed . . . a plan best adapted to develop, conserve, and utilize the resources of the region in the public interest.'" That comprehensive plan is apparently to permit all ground water pumping that does not threaten the minimum river flows at the Murphy gauging station agreed to between the State and Idaho Power. In making this argument, the Groundwater Users left out a significant portion of the provision from the Swan Falls Agreement that they quoted. It actually states:

---

[2] In the case cited (*Idaho Power v. Water Resources I*), the Court was addressing Idaho Code § 42-1736A, which was the legislative adoption of a modified version of the state water plan adopted by the Water Resource Board. This Court later held in *Idaho Power Co. v. State, Dept. of Water Resources*, 104 Idaho 570, 574, 661 P.2d 736, 740 (1983) (*Idaho Power v. Water Resources II*) that the legislature did not have the authority to modify a state water plan. *Id*. at 574, 661 P.2d at 740. The quotation from *Idaho Power v. Water Resources I* is still accurate because "the state water plan, H.C.R. No. 48, and I.C. § 42-1736A all provide for the same minimum stream flows at the Murphy gauging station." *Id*.

State and Company agree that the *resolution of Company's water rights* and recognition thereof by State together with the Idaho State Water Plan provide a sound comprehensive plan for the management of the Snake River watershed. Thus, the parties acknowledge that this Agreement provides a plan best adapted to develop, conserve, and utilize the water resources of the region in the public interest. Upon implementation of this agreement, State and Company will present the Idaho State Water Plan and this Agreement to FERC [Federal Energy Regulatory Commission] as a comprehensive plan for the management of the Snake River Watershed. (Emphasis added.)

It is only the resolution of Idaho Power's water rights that was at issue in the Swan Falls Agreement. The reference to "a comprehensive plan" was to meet the requirements of section 10 of the Federal Water Power Act with respect to hydropower licensing, codified at 16 U.S.C. § 803. When the Agreement was executed, section 10(a) provided:

That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a *comprehensive plan* for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.

49 Stat. 842 (emphasis added). The comprehensive plan had nothing to do with allocating water among the various appropriators upstream from the Swan Falls Dam or determining the priorities of their water rights. It was only to meet a federal licensing requirement of the Company's power projects.

The hearing officer noted that the 1986 Idaho State Water Plan commented that "minimum stream flows for the Murphy Gauging Station should provide an adequate supply of water for aquaculture." The Groundwater Users also point to prognostications that the Spring Users would have sufficient water if the river flow at the Murphy gauging station was maintained in accordance with the minimum flows set forth in the Swan Falls Agreement. Prior to that agreement, the Water Resource Board had established a zero minimum flow at Milner Dam. Idaho Water Resource Bd., The State Water Plan – Part Two 116 (1976). The purpose of allowing a zero river flow at Milner Dam was to maximize the amount of water available for development above the dam, including groundwater development in the Aquifer. One of the statutes enacted to implement the Swan Falls Agreement sought to separate water administration

11

above and below the dam.[3] In its 1996 State Water Plan, the Water Resource Board recognized that "[t]he exercise of water rights above Milner Dam has and may reduce flow at the dam to zero." Idaho Water Resource Bd., The State Water Plan 17 (1996). "During portions of low-water years, river flows downstream from Milner Dam to the Murphy gaging station consist almost entirely of ground-water discharge from the Thousand Springs reach." *Id*. at 19. The assumption was that if there was enough spring discharge to have 3,900 c.f.s. downstream at the Swan Falls Dam, there would be enough spring discharge to satisfy the Spring Users' water rights. Such predictions have no legal effect.

The State Water Plans recognized that such assumptions may not be correct. The first plan stated, "Future management and development of the Snake River aquifer *may reduce* the present flow of springs tributary to the Snake River. *If that situation occurs*, adequate water for aquaculture will be protected, however, aquaculture interests may need to construct different water diversion facilities than presently exist." Idaho Water Resource Bd., The State Water Plan – Part Two 118 (1976) (emphases added). Likewise, the second plan acknowledged with respect to aquaculture that "future management and development of the Snake River Plain aquifer *may reduce* the present flow of springs tributary to the Snake River, necessitating changes in diversion facilities." Idaho Water Resource Bd., The State Water Plan 38 (1986) (emphasis added). Finally, the current water plan recognized the "continued spring flow decline in the Thousand Springs area since the late 1950s." Idaho Water Resource Bd., The State Water Plan 18 (1996). It also commented: "Spring discharge in the American Falls and Thousand Springs reaches of the Snake River are vital to the Snake River Basin and Idaho economy. . . . In the Thousand Springs reach, spring flow is the only practical source of water for many of the state's aquaculture facilities." *Id*. at 19. It declared, "Maintaining these discharges should be a goal of water managers." *Id*.

---

[3] Idaho Code § 40-203B(2) was amended by the addition of a provision stating as follows:

> For the purposes of the determination and administration of rights to the use of the waters of the Snake river or its tributaries downstream from Milner dam, no portion of the waters of the Snake river or surface or ground water tributary to the Snake river upstream from Milner dam shall be considered.

Ch. 117, § 1, 1986 Idaho Sess. Laws 308, 309.

"It is the unquestioned rule in this jurisdiction that priority of appropriation shall give the better right between those using the water." *Beecher v. Cassia Creek Irrigation Co.*, 66 Idaho 1, 9, 154 P.2d 507, 510 (1944); Idaho Const. Art. XV, § 3. Conjecture that a junior appropriator's use of water will not adversely impact a senior appropriator's water right does not change the doctrine of prior appropriation. For example, in *Parker v. Wallentine*, 103 Idaho 506, 650 P.2d 648 (1982), the Department of Water Resources granted a permit for an irrigation well, but when a pump test was performed on the well, it lowered the water table to the extent that an existing domestic well ceased to produce water. We noted, "In this very case the record demonstrates that the Department issued the water permit to Wallentine [junior appropriator] because its experts did not expect that the Wallentine well would have a significant impact on the Parker domestic well. This later proved to be incorrect." *Id*. at 510, 650 P.2d at 652. We upheld the prior appropriator's water right, holding that the trial court properly enjoined the use of the subsequent appropriator's irrigation well. *Id*. at 513, 650 P.2d at 655. However, we stated that the junior appropriator could have the injunction vacated if he paid the expense of changing the prior appropriator's method or means of diversion (e.g., by digging him a deeper well) so that they both could be supplied with water. *Id.* at 514, 650 P.2d at 656.

The issue in this case is not the hoped-for benefits that would come from Idaho Power partially subordinating its water rights at the Swan Falls Dam. Rather, it is whether in this instance the Groundwater Users who have water rights junior to those of the Spring Users are causing material injury to the latter's water rights. When the Swan Falls Agreement was executed, the parties knew that there needed to be a better understanding of the hydrology of the Aquifer and its hydraulic connection with the Snake River and its tributaries. The Agreement included a provision stating that the parties would support legislation to obtain a $200,000 appropriation "to be used for the purpose of conducting hydrologic and economic studies of the Snake River Basin." Since then, such knowledge has significantly increased, and the Department now uses a calibrated ground water model that was reformulated in 2004. The district court did not err in holding that the curtailment orders do not violate the Swan Falls Agreement.

**B.1. Did the District Court Err in Holding that the Curtailment Orders Do Not Violate the Full Economic Development Provision of Idaho Code § 42-226?**

Idaho Code § 42-226 provides with respect to groundwater resources that the reasonable exercise of the rights of a prior ground water appropriator "shall not block full economic development of underground water resources." Based upon this provision in the statute, the Groundwater Users asserted in the agency proceedings that any economic benefit to the Spring Users resulting from the curtailment orders would be more than offset by the severe economic damage to others caused by the curtailment of the Groundwater Users' water rights. They raised the same argument in the district court, which held that this provision of the statute applied to the means of diversion and that the Director did not abuse his discretion by failing to order the Spring Users to change their means of diversion by drilling wells. Relying upon section 42-226, the Groundwater Users contend on appeal that "[i]f curtailment will result in substantial economic harm, the senior's water delivery call must be rejected." That argument misinterprets the statute.

The Idaho Constitution confirmed the doctrine of prior appropriation with respect to surface waters. Section 3 provides: "The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses, shall never be denied . . . . Priority of appropriation shall give the better right as between those using the water . . . ." However, the Constitution makes no mention of ground water rights. In 1899, the legislature provided a statutory basis for the appropriation of "subterranean waters" in addition to the waters of "rivers, streams, lakes, [and] springs." Sec. 2, 1899 Idaho Sess. Laws 380, 380. We later held that the prior appropriation doctrine applies to ground water. *Bower v. Moorman*, 27 Idaho 162, 181, 147 P. 496, 502 (1915).

In *Noh v. Stoner*, 53 Idaho 651, 26 P.2d 1112 (1933), we held, with respect to ground water rights, that the prior appropriation doctrine protected the senior appropriator's means of diversion. The prior appropriators had two wells, and the subsequent appropriators drilled a well into the same aquifer, but at a deeper level. When they commenced pumping, it lowered the water level in the aquifer to such an extent that the prior appropriators' wells went dry. We ruled that the prior appropriator's rights included the right to divert water in their historical manner and that they were not required to bear the cost of drilling a deeper well so that a subsequent appropriator could also obtain ground water. If they were required to lower their wells to obtain water, "it would result ultimately in a race for the bottom of the artesian belt." *Id*. at 656, 26 P.2d at 1114. "If subsequent appropriators desire to engage in such a contest the financial

14

burden must rest on them and with no injury to the prior appropriators or loss of their water." *Id.* at 657, 26 P.2d at 1114.

In 1951, the legislature enacted the Ground Water Act. Ch. 200, §§ 1-16, 1951 Idaho Sess. Laws 423, 423-29. The section of that Act that was codified as Idaho Code § 42-226 provided:

> It is hereby declared that the traditional policy of the state of Idaho, requiring the water resources of this state to be devoted to beneficial use in reasonable amounts through appropriation, is affirmed with respect to the ground water resources of this state as said term is hereinafter defined. All ground waters in this state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same for beneficial use. All rights to the use of ground water in this state however acquired before the effective date of this act are hereby in all respects validated and confirmed.

Ch. 200, § 1, 1951 Idaho Sess. Laws 423, 423-24.

In 1953, the legislature amended section 42-226 by adding the following language at the end of the first sentence:

> and, while the doctrine of "first in time is first in right" is recognized, a reasonable exercise of this right shall not block full economic development of underground water resources, but early appropriators of underground water shall be protected in the maintenance of reasonable ground water pumping levels as may be established by the state reclamation engineer as herein provided.

Ch. 182, § 1, 1953 Idaho Sess. Laws 277, 278. The 1953 amendment modified the doctrine of first in time is first in right for ground water appropriators only with respect to their pumping levels. It "established the reasonable pumping level limitation on the doctrine of first in time is first in right." *Parker v. Wallentine*, 103 Idaho 506, 511, 650 P.2d 648, 653 (1982).

The reference to "full economic development of underground water resources" does not mean that the ground water appropriator who is producing the greater economic benefit or would suffer the greater economic loss is entitled to the use of the ground water when there is insufficient water for both the senior and junior appropriators. If that were the basis for allocating water in times of shortage, then water would be allocated among farmers based upon the market prices of their respective crops and their expected yields. Rather, the purpose of the 1953 amendment was to change the holding in *Noh v. Stoner*, 53 Idaho 651, 26 P.2d 1112 (1933), that a prior appropriator of ground water was protected in his historic pumping level.

15

As we explained in *Baker v. Ore-Ida Foods, Inc.*, 95 Idaho 575, 581-82, 513 P.2d 627, 633-34 (1973): "*Noh* suggests that a senior appropriator of ground water is forever protected from any interference with his method of diversion. . . . Apparently our Ground Water Act was intended to eliminate the harsh doctrine of *Noh*." The 1953 amendment recognized that in order for there to be full economic development of underground water resources, a senior appropriator with a shallow well should not be able to block subsequent appropriators of groundwater. To prevent that from occurring, the senior appropriator is protected only "in the maintenance of reasonable ground water pumping levels as may be established by the state reclamation engineer." Idaho Code § 42-226. First in time and first in right, full economic development, and reasonable pumping levels are not three separate factors that can determine the allocation of ground water among competing appropriators. Rather, with respect to ground water pumping, the prior appropriation doctrine was modified so that it only protects senior ground water appropriators in the maintenance of reasonable pumping levels in order to obtain full economic development of ground water resources. *Compare* "*Noh* was inconsistent with the full economic development of our ground water resources," *Baker* at 581-82, 513 P.2d at 633-34, *with* "We hold *Noh* to be inconsistent with the constitutionally enunciated policy of optimum development of water resources in the public interest," *id.* at 583, 513 P.2d at 635. Likewise, we equated "optimum development" with "full economic development" when we stated: "We hold that the Ground Water Act is consistent with the constitutionally enunciated policy of promoting optimum development of water resources in the public interest. Full economic development of Idaho's ground water resources can and will benefit all of our citizens." *Id.* at 584, 513 P.2d at 636 (citation omitted).

In summarizing the effect of the 1953 amendment to Idaho Code § 42-226, we stated: "A senior appropriator is only entitled to be protected to the extent of the 'reasonable ground water pumping levels' as established by the IDWA [Idaho Department of Water Administration, now Idaho Department of Water Resources]. I.C. § 42-226. A senior appropriator is not absolutely protected in either his historic water level or his historic means of diversion." *Id.* at 584, 513 P.2d at 636. We then stated, "Our Ground Water Act contemplates that in some situations senior appropriators may have to accept some modification of their rights in order to achieve the goal of full economic development." *Id.* The only right modified concerned the prior appropriator's

16

pumping level. The prior appropriator was protected to a reasonable pumping level, not his historic pumping level. We concluded by stating:

> We conclude that our legislature attempted to protect historic water rights while at the same time promoting full development of ground water. *Priority rights in ground water are and will be protected insofar as they comply with reasonable pumping levels.* Put otherwise, although a senior may have a prior right to ground water, if his means of appropriation demands an unreasonable pumping level his historic means of appropriation will not be protected.

*Id*. (emphasis added). Thus, the reference to "full economic development of underground water resources" refers to promoting full development of ground water by not permitting a ground water appropriator with an unreasonably shallow well to block further use of the aquifer.

A delivery call cannot be denied on the ground that curtailment of junior appropriators would result in substantial economic harm. Such a holding would be contrary to the provision in Idaho Code § 42-233a (emphases added), stating:

> The director, upon determination that the ground water supply is insufficient to meet the demands of water rights within all or portions of a critical ground water area, shall order those water right holders *on a time priority basis*, within the area determined by the director, *to cease or reduce withdrawal of water* until such time as the director determines there is sufficient ground water.

In this case, it would also be contrary to Article XV, § 3, of the Idaho Constitution, which states, "Priority of appropriation shall give the better right as between those using the water . . . ." Likewise, the Groundwater Users' arguments are not consistent with the definition of "Full Economic Development of Underground Water Resources" in the Conjunctive Management Rules.

> The diversion and use of water from a ground water source for beneficial uses in the public interest at a rate that does not exceed the reasonably anticipated average rate of future natural recharge, in a manner that does not result in material injury to senior-priority surface or ground water rights, and that furthers the principle of reasonable use of surface and ground water as set forth in Rule 42.

IDAPA 37.03.11.010.07.

The Groundwater Users' argument is also contrary to the State Water Plan. The Idaho Water Resource Board is to "progressively formulate, adopt and implement a comprehensive state water plan for conservation, development, management and optimum use of all unappropriated water resources and waterways of this state in the public interest." Idaho Code §

17

42-1734A. One of the requirements of the Plan is that "[e]xisting rights, established duties, and the relative priorities of water established in article XV, section 3, of the constitution of the state of Idaho, shall be protected and preserved." Idaho Code § 42-1734A(a).

The Groundwater Users contend that they are protected from delivery calls as long as they are maintaining reasonable ground water pumping levels. The reference to reasonable pumping levels only applies to the senior appropriator, not to junior appropriators. It is the "prior appropriators" of underground water who are protected "in the maintenance of reasonable ground water pumping levels," Idaho Code § 42-226, and in context it is only when there is a conflict between senior and junior ground water appropriators. There is nothing in the language of the statute that purports to permit a junior ground water appropriator to cause material injury to the water rights of a senior appropriator as long as the junior appropriator is maintaining a reasonable pumping level. This is shown by Idaho Code § 42-237a, which provides, in part, "Water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, *the present or future use of any prior surface or ground water right . . . .*" (Emphasis added).

Relying upon Idaho Code § 42-237a, the Groundwater Users claim, "The Act enables groundwater development to expand so long as it does not 'result in the withdrawing of the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge' (i.e. so long as withdrawals do not outpace inputs)." They assert, "Simply stated, if hydraulic conditions can sustain the existing diversions from the aquifer, the Act precludes curtailment." Again, the Groundwater Users are simply misreading the statute.

The relevant portion of the statute provides:

Water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, the present or future use of any prior surface or ground water right or result in the withdrawing of the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge.

The statute merely provides that well water cannot be used to fill a ground water right if doing so would either: (a) cause material injury to any prior surface or ground water right or (b) result in withdrawals from the aquifer exceeding recharge. There is absolutely nothing in the

18

statute that could be interpreted as providing that ground water users are exempt from the doctrine of prior appropriation as long as they are not mining the aquifer. Likewise, there is nothing in the statute regarding the administration of surface water rights. It empowers the director to take certain actions "in the effectuation of the policy of this state to conserve its ground water resources." Idaho Code § 42-237a. One of those listed powers is "[t]o supervise and control the exercise and administration of all rights to the use of ground waters," which can include initiating "administrative proceedings to prohibit or limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available." *Id*.

The Groundwater Users also argue that the curtailment orders violate Idaho Code § 42-226 because "[t]he orders do not address administration of the [Aquifer] based on reasonable aquifer levels at all." In essence, they argue that the Spring Users' priority rights should be protected only in the maintenance of a reasonable aquifer level. If that level does not result in sufficient water discharge from the springs, the Spring Users are not entitled to curtailment orders. There is nothing in the statute addressing reasonable aquifer levels. It only mentions reasonable pumping levels. By its terms, section 42-226 only applies to appropriators of ground water. The Spring Users are not appropriators of ground water, which is defined as "all water under the surface of the ground whatever may be the geological structure in which it is standing or moving," Idaho Code § 42-230(a). They are appropriators of surface water flowing from springs. The district court did not err in holding that the curtailment orders do not violate Idaho Code §§ 42-226 and 42-237a.

**B.2. Full Economic Development.**

The Groundwater Users also contend that "the district court acknowledged that both the CM [Conjunctive Management] Rules and Idaho Code § 42-226 require analysis of full economic development, but the court refused to reverse the curtailment orders . . . ." They assert that full economic development requires that they be permitted to withdraw as much water from the Aquifer as they need (as long as total annual withdrawals do not exceed annual recharge), even if doing so deprives senior surface water users of water. They state, "Former Director Ken Dunn testified that because of the Act's directive for full economic development of groundwater

19

resources, 'the Department would not have permitted spring users in the thousand springs reach to curtail ground water pumping on the Eastern Snake River Plain.'" They argue:

> The ultimate criterion of groundwater administration is "how best to utilize the annual supply without over-drafting the stock which maintains the aquifer's water level."
>
> That is not to say that the directive for full economic development does away with the right of priority. To the extent necessary to prevent over-drafting of the aquifer, priority of right still determines which water rights get shut off to maintain a stable water table. (Citations omitted.)

Thus, they contend that as long as the Aquifer is not being over-drafted, priority of water rights as between surface and ground water users is not to be considered. They assert that the director must simply determine a reasonable aquifer level and manage the Aquifer based upon that determination. They state, "The central premise of the [Ground Water] Act is that the [Aquifer] and other aquifers will be administered to achieve full economic development by protecting the use of groundwater provided reasonable, sustainable aquifer levels are maintained." According to the Groundwater Users, the curtailment orders "do not address administration of the [Aquifer] based on reasonable aquifer levels at all" and that curtailment was ordered "without any meaningful analysis of the most defining statutory criteria for administering groundwater rights in response to delivery calls made by surface water rights." In support of their argument, they cite Conjunctive Management Rule 20.03, and they assert that the district court "mistakenly assumed the Director actually made a determination of reasonable aquifer levels."

We begin our analysis of these arguments with Conjunctive Management Rule 20.03, which provides:

> These rules integrate the administration and use of surface and ground water in a manner consistent with the traditional policy of reasonable use of both surface and ground water. The policy of reasonable use includes the concepts of priority in time and superiority in right being subject to conditions of reasonable use as the legislature may by law prescribe as provided in Article XV, Section 5, Idaho Constitution, optimum development of water resources in the public interest prescribed in Article XV, Section 7, Idaho Constitution, and full economic development as defined by Idaho law. An appropriator is not entitled to command the entirety of large volumes of water in a surface or ground water source to support his appropriation contrary to the public policy of reasonable use of water as described in this rule.

IDAPA 37.03.11.020.03.

On its face, the rule does not state that priority of right as between a senior surface water user and junior ground water users is to be disregarded as long as the Aquifer is not being overdrawn by ground water users. Likewise, the authorities cited in the Rule do not so state.

The rule cites Article XV, § 5, of the Idaho Constitution, which states:

> Whenever more than one person has settled upon, or improved land with the view of receiving water for agricultural purposes, under a sale, rental, or distribution thereof, as in the last preceding section of this article provided, as among such persons, priority in time shall give superiority of right to the use of such water in the numerical order of such settlements or improvements; but whenever the supply of such water shall not be sufficient to meet the demands of all those desiring to use the same, such priority of right shall be subject to such reasonable limitations as to the quantity of water used and times of use as the legislature, having due regard both to such priority of right and the necessities of those subsequent in time of settlement or improvement, may by law prescribe.

Section 5 refers to the preceding section, Section 4, which provides:

> Whenever any waters have been, or shall be, appropriated or used for agricultural purposes, under a sale, rental, or distribution thereof, such sale, rental, or distribution shall be deemed an exclusive dedication to such use; and whenever such waters so dedicated shall have once been sold, rented or distributed to any person who has settled upon or improved land for agricultural purposes with the view of receiving the benefit of such water under such dedication, such person, his heirs, executors, administrators, successors, or assigns, shall not thereafter, without his consent, be deprived of the annual use of the same, when needed for domestic purposes, or to irrigate the land so settled upon or improved, upon payment therefor, and compliance with such equitable terms and conditions as to the quantity used and times of use, as may be prescribed by law.

In *Mellen v. Great Western Beet Sugar Co.*, 21 Idaho 353, 122 P. 30 (1912), we stated, "The two sections must therefore be read and construed together." *Id.* at 359, 122 P. at 32. Neither section applies to conjunctive management, and neither applies in this case.

First, neither section applies to the water user who has appropriated water directly from the water source. Section 4 applies to waters that "have been, or shall be, appropriated or used for agricultural purposes, under a sale, rental, or distribution thereof." Section 5 applies to any person(s) who have "settled upon, or improved land with the view of receiving water for agricultural purposes, under a sale, rental, or distribution thereof, as in the last preceding section [section 4] provided." Both sections apply where the water was appropriated, used, or intended to be used "under a sale, rental, or distribution thereof." As we stated in *Mellen*, "The framers of

21

our Constitution evidently meant to distinguish settlers who procure a water right under a sale, rental, or distribution, from that class of water users who procure their water right by appropriation and diversion directly from the natural stream." *Id*. at 359, 122 P. at 31. In *Mellen*, we quoted Mr. Claggett's explanations during the Constitutional Convention, who we stated "seemed to have a very clear understanding of the provisions." *Id*. at 360, 122 P. at 32. We also noted that Mr. Claggett "was the only one who spoke in favor of their [sections 4 and 5] adoption, and his discussion and explanation seems to have been accepted by the majority of the convention as they voted down the amendments presented by Gray, Hampton, and Poe, and adopted the provisions as they now stand." *Id*. As Mr. Claggett explained with respect to these two sections: "Neither one of them applies to a case of a water right where a man takes water out and puts it upon his own farm. It applies to cases only as both sections specify, say to those cases where waters are 'appropriated or used for agricultural purposes under a sale, rental or distribution.'" *Id*. at 361, 122 P. at 32. Sections 4 and 5 were added to make it clear that water rights held by canal companies remained subject to state regulation and use by those who relied upon such water for agricultural purposes. As Mr. Claggett stated with respect to these sections:

> This thing has got to be regulated by statute, and the constitution proposes simply to point out the line of the principles within which legislation must be carried on; that is to say, to recognize the right of priority in the order of time of settlement or improvement, as the case may be; and then when the water runs short or anything of that kind, it has got to be regulated from time to time and from year to year as the legislatures meet, and as experience shall suggest, in such manner as to promote the greatest good to the greatest number, bearing in mind constantly the fact of the prior right of the first man as well as the necessities of the second, and you cannot get it any closer than that.

II Proceedings and Debates of the Constitutional Convention of Idaho 1889, 1181 (I. W. Hart ed., Caxton Printers, Ltd., 1912). Similarly, Section 1 declared to be a public use, "subject to the regulations and control of the state in the manner prescribed by law," the use of water appropriated "for sale, rental or distribution" and water appropriated for private use but later "sold, rented, or distributed." Idaho Const. Art. XV, § 1. Because the Spring Users have directly appropriated water from their respective water sources, these sections do not apply to them.

Second, both sections only apply to water that was intended to be used or was used for agricultural purposes. Section 4 begins, "Whenever any waters have been, or shall be, appropriated or used for agricultural purposes . . . ." Section 5 begins, "Whenever more than one

22

person has settled upon, or improved land with the view of receiving water for agricultural purposes . . . ." Again, as Mr. Claggett explained, because people would locate farms along the line of the canal owner's proposed ditches upon the promise that water would be available for agricultural purposes, "the water should not be allowed to be diverted from that purpose and applied to the running of manufactories or anything else of that sort." *Id*. at 361, 122 P. at 32. Mr. Claggett further explained, "The first section [section 4] protects the person who comes in, by making it 'an exclusive dedication' to agricultural uses after it has been so appropriated and so used." *Id*. In *Mellen*, we stated that the clear intent of these two sections was that "whenever water is once appropriated by any person or corporation for use in agricultural purposes under a sale, rental, or distribution, it shall never be diverted from that use and purpose so long as there may be any demand for the water and to the extent of such demand for agricultural purposes." *Id*. at 359, 122 P. at 31-32. The Spring Users' water rights at issue in this case were not appropriated or being used for agricultural purposes.

Third, both sections only apply where the water is distributed by a ditch or canal owner for use by others. As we stated in *Mellen*:

> The constitutional convention, accordingly, inserted sections 4 and 5, in article 15, of the Constitution, for the purpose of defining the duties of ditch and canal owners who appropriate water for agricultural purposes to be used "under a sale, rental or distribution," and to point out the respective rights and priorities of the users of such waters.

*Id*. at 359, 122 P. at 31. We added, "[S]ection 4 is dealing chiefly with the ditch or canal owner, while section 5 is dealing chiefly with the subject of priorities as between water users and consumers who have settled under these ditches and canals and who expect to receive the water under a 'sale, rental or distribution thereof.'" *Id*. at 359, 122 P. at 32. Neither circumstance applies in this case.

Finally, neither section governs conjunctive management. They only govern the distribution of certain surface waters.

Conjunctive Management Rule 20.03 also mentions Article XV, § 7, of the Constitution which provides:

> There shall be constituted a Water Resource Agency, composed as the Legislature may now or hereafter prescribe, which shall have power to construct and operate water projects; to issue bonds, without state obligation, to be repaid from revenues of projects; to generate and wholesale hydroelectric power at the

site of production; to appropriate public waters as trustee for Agency projects; to acquire, transfer and encumber title to real property for water projects and to have control and administrative authority over state lands required for water projects; all under such laws as may be prescribed by the Legislature. Additionally, the State Water Resource Agency shall have power to formulate and implement a state water plan for optimum development of water resources in the public interest. The Legislature of the State of Idaho shall have the authority to amend or reject the state water plan in a manner provided by law. Thereafter any change in the state water plan shall be submitted to the Legislature of the State of Idaho upon the first day of a regular session following the change and the change shall become effective unless amended or rejected by law within sixty days of its submission to the Legislature.

This section includes a provision stating that "the State Water Resource Agency shall have power to formulate and implement a state water plan for optimum development of water resources in the public interest." It also states that "[t]he Legislature of the State of Idaho shall have the authority to amend or reject the state water plan in a manner provided by law." This latter provision was added in 1984 after this Court in 1983 had ruled in *Idaho Power Co. v. State Department of Water Resources*, 104 Idaho 570, 661 P.2d 736 (1983), that the legislature lacked that authority.

There is nothing in the wording of Article XV, § 7, that indicates that it grants the legislature or the Idaho Water Resource Board the authority to modify that portion of Article XV, § 3, which states, "Priority of appropriation shall give the better right as between those using the water [of any natural stream] . . . ."[4] The current State Water Plan does not purport to do so. It provides, "The goal of conjunctive management is to protect the holders of prior water rights while allowing for the optimum development and use of the state's water resources." Idaho Water Resource Board, The State Water Plan 6 (1996).

Conjunctive Management Rule 20.03 also refers to "full economic development as defined by Idaho law." The words "full economic development" only appear in Idaho Code § 42-226 and the cases discussing that statute. *See American Falls Reservoir Dist. No. 2 v. Idaho Dept. of Water Resources*, 143 Idaho 862, 867, 154 P.3d 433, 438 (2007); *Parker v. Wallentine*, 103 Idaho 506, 509-10, 650 P.2d 648, 651-52 (1982); *Baker v. Ore-Ida Foods, Inc.*, 95 Idaho 575, 576, 513 P.2d 627, 628 (1973); and *State ex rel. Tappan v. Smith*, 92 Idaho 451, 455, 444

---

[4] By "priority of appropriation," we are not referring to being protected in an unreasonable means of diversion.

P.2d 412, 416 (1968). As explained above, Idaho Code § 42-226 has no application to this case. It only modifies the rights of ground water users with respect to being protected in their historical pumping levels.

The Groundwater Users' argument that full economic development means that priority of right is taken into consideration in managing the Aquifer only as necessary to prevent over-drafting of the Aquifer is not consistent with Idaho law. It would, in essence, preclude conjunctive management of the Aquifer. Conflicts between senior surface water users and junior ground water users would be ignored as long as withdrawals from the Aquifer and recharge were in balance. That argument is contrary to the current State Water Plan, which provides, "It is the policy of Idaho that where evidence of hydrologic connection exists between ground and surface waters, they are managed conjunctively in recognition of the interconnection." Idaho Water Resource Board, The State Water Plan 6 (1996). As we held in *Musser v. Higginson*, 125 Idaho 392, 871 P.2d 809 (1994), hydrologically connected surface and ground waters must be managed conjunctively.

In *Stickney v. Hanrahan*, 7 Idaho 424, 435, 63 P. 189, 192 (1900), we said:

> It is against the spirit and policy of our constitution and laws, as well as contrary to public policy, to permit the wasting of our waters, which are so badly needed for the development and prosperity of the state, and every act on the part of any individual claimant that tends to waste water is to be discouraged rather than encouraged.

The following year, the legislature enacted what is now codified as Idaho Code § 42-101 and which provides in part:

> Water being essential to the industrial prosperity of the state, and all agricultural development throughout the greater portion of the state depending upon its just apportionment to, and economical use by, those making a beneficial application of the same, its control shall be in the state, which, in providing for its use, shall equally guard all the various interests involved.

In *Niday v. Barker*, 16 Idaho 73, 79, 101 P. 254, 256 (1909), we stated, "The theory of the law is that the public waters of this state shall be subjected to the highest and greatest duty." In *Farmers' Co-operative Ditch Co. v. Riverside Irrigation District, Ltd.*, 16 Idaho 525, 535, 102 P. 481, 483 (1909), we phrased it, "Economy must be required and demanded in the use and application of water." In *Poole v. Olaveson*, 82 Idaho 496, 502, 356 P.2d 61, 65 (1960), we

25

expressed the same concept by stating, "The policy of the law of this State is to secure the maximum use and benefit, and least wasteful use, of its water resources."

The Idaho Water Resource Board and the Idaho legislature have the power to formulate and implement a state water plan for "optimum development of water resources in the public interest." Idaho Const. Art. XV, § 7. There is no difference between securing the maximum use and benefit, and least wasteful use, of this State's water resources and the optimum development of water resources in the public interest. Likewise, there is no material difference between "full economic development" and the "optimum development of water resources in the public interest." They are two sides of the same coin. Full economic development is the result of the optimum development of water resources in the public interest. As we stated in *Parker v. Wallentine*, 103 Idaho 506, 513, 650 P.2d 648, 655 (1982), "[I]t is clearly state policy that water be put to its maximum use and benefit. That policy has long been recognized in this state and was reinforced in 1964 by the adoption of article XV, section 7 of the Idaho Constitution." When discussing the Ground Water Act and particularly Idaho Code § 42-226, we stated, "The Ground Water Act was the vehicle chosen by the legislature to implement the policy of optimum development of water resources." *Id*. at 512, 650 P.2d at 654. The policy of securing the maximum use and benefit, and least wasteful use, of the State's water resources applies to both surface and underground waters, and it requires that they be managed conjunctively.

Over one hundred years ago, we held that a senior appropriator was not protected in an unreasonable means of appropriation. In *Van Camp v. Emery*, 13 Idaho 202, 89 P. 752 (1907), the senior appropriator dammed a creek so that the water would back up, raising the water table to subirrigate his lands. This Court held that although he could divert water from the stream to fill his water right, he could not dam or impede the flow of the remaining water in order to cause a subirrigation of his meadows. We stated:

> In this arid country, where the largest duty and the greatest use must be had from every inch of water in the interest of agriculture and home building, it will not do to say that a stream may be dammed so as to cause subirrigation of a few acres at a loss of enough water to surface irrigate 10 times as much by proper application.

*Id*. at 208, 89 P. at 754.

Conjunctive Management Rule 20.03 states, "An appropriator is not entitled to command the entirety of large volumes of water in a surface or ground water source to support his

appropriation contrary to the public policy of reasonable use of water . . . ." That is consistent with our holding in *Van Camp*. The senior appropriator in *Van Camp* was entitled to his water right; he simply had to change his unreasonable means of diversion. As we stated, "Whatever amount of water defendant shows himself entitled to for the irrigation of his meadows or other lands as a prior right over the plaintiff, the judgment should so decree, but beyond that he cannot go under any other pretext or claims for the natural condition of the stream." *Id.*

The Groundwater Users also argue that the curtailment orders violate *Schodde v. Twin Falls Land & Water Co.*, 224 U.S. 107 (1912). In *Schodde*, the senior appropriator had constructed water wheels along the banks of the Snake River. As the river current turned the wheels, they lifted water out of the river in attached buckets and emptied the water into flumes for distribution through ditches to irrigate the senior appropriator's lands. The junior appropriator constructed a dam downstream from the water wheels. The dam backed up the river to a point upstream from the wheels, and as a result there was no longer any river current to operate them. The senior appropriator sued for damages in federal district court, and it dismissed the complaint. It held that "there was no right under the Constitution and laws of the state of Idaho to appropriate the current of the river so as to render it impossible for others to apply the otherwise unappropriated waters of the river to beneficial uses." *Id.* at 117. The district court held that the use of the river current to operate the water wheels was not an appropriation because it was not reasonable. The court stated, "As before suggested, there is neither statutory nor judicial authority that such a use is an appropriation. Such use also lacks one of the essential attributes of an appropriation;-it is not reasonable." *Id.* at 118. The federal court of appeals affirmed the dismissal, holding that "the extent of beneficial use was an inherent and necessary limitation upon the right to appropriate." *Id.* at 120. The court of appeals also stated that if the prior appropriator was permitted to own the current of the river in order to operate his means of diversion, it would prevent upstream appropriations that would lower the river level. "It is clear that in such a case the policy of the state to reserve the waters of the flowing streams for the benefit of the public would be defeated." *Id.*

The issue in *Schodde* was whether the senior appropriator was protected in his means of diversion, not in his priority of water rights. Thus, in *American Falls Reservoir District No. 2 v. Idaho Department of Water Resources*, 143 Idaho 862, 877, 154 P.3d 433, 448 (2007), we cited

*Shodde* for the proposition that "evaluation of whether a diversion is reasonable in the administration context should not be deemed a re-adjudication [of a water right]."

Under the law, the Groundwater Users' arguments regarding reasonable aquifer levels and full economic development must challenge the Spring Users' means of diversion. The factors that the Director may consider in determining whether the holder of a water right is suffering material injury and using water efficiently and without waste include "[t]he extent to which the requirements of the senior-priority surface water right could be met using alternate reasonable means of diversion . . ., including the construction of wells . . . to divert and use water from the area having a common ground water supply under the petitioner's surface water right priority." IDAPA 37.03.11.042.01.h. Based upon a field investigation of the Spring Users' facilities by a registered professional civil engineer, the Director found that they were employing reasonable diversions, conveyance efficiency, and conservation practices, with the exception of one pipeline at the Clear Springs's facility that was found to be in disrepair and leaking water. The Director also found that there were no alternate reasonable means of diversion or alternate points of diversion that the Spring Users should be required to implement.

In their petition for judicial review before the district court, the Groundwater Users raised as an issue, "Whether the Director erred by failing to exercise his authority under the Conjunctive Management Rules to compel Blue Lakes and Clear Springs to convert to a ground water source." "Somewhere between the absolute right to use a decreed water right and an obligation not to waste it and to protect the public's interest in this valuable commodity, lies an area for the exercise of discretion by the Director." *American Falls Reservoir Dist. No. 2 v. Idaho Dept. of Water Resources*, 143 Idaho 862, 880, 154 P.3d 433, 451 (2007). The district court noted that Director Dreher had determined that the Spring Users were employing reasonable diversion, conveyance efficiency, and conservation practices and that it would not be reasonable to require them to drill horizontal wells in order to obtain water. The district court determined, "While there may be significant disagreement over the Director's determination of reasonableness and the result ultimately reached, no concrete evidence was presented of viable reasonable alternatives." The court held that the Director had not abused his discretion or acted arbitrarily or capriciously in his determination. The Groundwater Users have not appealed that holding by the district court. Therefore, whether the Director should have required that the

Spring Users change their means of diversion to an underground water source is not an issue on this appeal.[5]

**C. Did the District Court Err in Upholding the Director's Determination that the Ground Water Depletions Caused Material Injury to the Spring Users' Water Rights?**

Prior to the administrative hearing, the Groundwater Users sent the Spring Users discovery requests for information that included fish production records. The Spring Users sought a protective order from the hearing officer, and he ruled that such information was not discoverable based upon prior authority from the SRBA. He also ruled, "However, if that information is not produced in discovery Blue Lakes and Blue Springs may not introduce information from the records to support any position they assert, e.g. more water allows the production of more or larger healthy fish."

After the hearing officer issued his proposed findings of fact and conclusions of law, the Groundwater Users filed objections with the Director in which they argued that there was no evidence showing that the Spring Users could grow more fish if they had more water or that any increased production of fish could be marketed at a profit. Absent such evidence, they contended that there was no evidence of material injury to the Spring Users' water rights. The Director did not accept that argument. The Groundwater Users also argued to the district court the finding of material injury is not supported by the evidence without a showing that "additional water accruing from curtailment of junior ground pumpers would enable Spring Users to increase fish production."

The Groundwater Users contend that a decreased water supply is not sufficient to show material injury. Rather, they argue that there must be evidence showing that with more water the Spring Users could produce more fish and profitably sell them.

"The first appropriator of water for useful or beneficial purposes has the prior right thereto, and the right, once vested, will be protected and upheld, unless abandoned." *Bower v. Moorman*, 27 Idaho 162, 181, 147 P. 496, 502 (1915). The right to appropriate water is for

---

[5] In *Parker v. Wallentine*, 103 Idaho 506, 514, 650 P.2d 648, 656 (1982), we held, "The expense of changing the method or means of diversion, however, must be paid by the subsequent appropriator . . . so that [the senior appropriator] will not suffer any monetary loss."

"beneficial uses," Idaho Const. Art XV, § 3, not merely for profitable businesses. Beneficial use is not defined in the Constitution, nor has it been comprehensively defined by statute or by this Court. *State, Dept. of Parks v. Idaho Dept. of Water Admin.*, 96 Idaho 440, 443, 530 P.2d 924, 927 (1974). However, a beneficial use is not limited to a use that generates a profit, or even income. For example, the Constitution lists using water for "domestic purposes" as a beneficial use. Idaho Const. Art XV, § 3. We have held that "firefighting" is a beneficial use of water. *A & B Irr. Dist. v. Idaho Conservation League*, 131 Idaho 411, 415, 958 P.2d 568, 572 (1997). Likewise, the legislature has declared as beneficial uses "drinking water," Idaho Code § 39-102(2), "the watering of domestic livestock," Idaho Code § 42-114, using low temperature geothermal resources "primarily for heat value," Idaho Code § 42-233, using instream water "for the protection of fish and wildlife habitat, aquatic life, recreation, aesthetic beauty, transportation and navigation values, and water quality," Idaho Code § 42-1501, and using water in lakes and water discharging from springs for "scenic beauty." Idaho Code §§ 67-4301, 67-4304, & 67-4307 through 67-4311.

"Material injury" is defined by the Conjunctive Management Rules as "[h]indrance to or impact upon *the exercise of a water right* caused by the use of water by another person as determined in accordance with Idaho Law, as set forth in Rule 42." IDAPA 37.03.11.010.14 (emphasis added). The Rule requires impact upon the exercise of a water right. It does not require showing an impact on the profitability of the senior appropriator's business. Such a holding would conflict with Article XV, § 3, of the Idaho Constitution, which states that "[p]riority of appropriation shall give the better right as between those using the water." It would also require the Director or watermaster to examine the businesses of the senior and junior appropriators to determine which one could make the greater profit from the use of the water when there is a shortage. If business profitability was the basis for appropriation, decreed water rights would become meaningless. The issue would be which appropriator at the time could make the greater profit by using the water.

The amounts of the Spring Users' water rights had already been decreed based upon the amounts of water that they had diverted and applied to the beneficial use of fish propagation. Subject to the rights of senior appropriators, they are entitled the full amount of water they have been decreed for that use. As we have stated, "Any *interference with a vested right to the use of water*, whether from open streams, lakes, ponds, percolating or subterranean water, would entitle

30

the party injured to damages, and an injunction would issue perpetually restraining any such interference." *Bower*, 27 Idaho at 181, 147 P. at 502 (emphasis added). The district court did not err in holding that there was substantial evidence supporting the finding of material injury to the Spring Users' water rights.

**D. Did the District Court Err in Upholding the Director's Determination that the Spring Users' Delivery Calls Were Not Futile Absent Evidence that Spring Users Needed Additional Water to Produce More, Larger Fish?**

The Groundwater Users asserted prior to the agency hearing that the Spring Users' delivery calls were futile because the evidence "will show that there is little to no expectation that the shortages suffered by the spring users in this case will ever be restored." In his proposed findings of fact and conclusions of law, the hearing officer noted the challenge of applying the futile call rule when the junior appropriator is withdrawing ground water.

> [C]urtailing ground water pumping does not provide the immediacy of delivery to the senior user that would be present in the curtailment of surface water. Surface water travels in a channel from one source that may be seen to a destination that can be seen. It can be routed to a particular point. Ground water does not fall into this model. Its route is determined by the contours of fractured basalt interspersed at times with soil of a different composition. Part of the water curtailed may travel one direction, part another. The effects of curtailment may be years to be realized. The parameters of a futile call in surface to surface delivery do not fit in the administration of ground water. If the time for the delivery of water to avoid a futile call defense that is applicable in surface to surface water delivery were applied in calls for the curtailment of ground water, most calls would be futile. In effect ground water pumping could continue uncurtailed despite deleterious effects upon surface water use because curtailment would not have the immediate effect traditionally anticipated.

The hearing officer concluded that "the fact that curtailment will not produce sufficient water immediately to satisfy the senior rights does not render the calls futile. A reasonable time for the results of curtailment to be fully realized may require years, not days or weeks."

The Groundwater Users filed objections with the Director, arguing that the futile call rule should bar the curtailment. They asserted that it would take an unreasonable amount of time for the Spring Users to realize the additional water resulting from the curtailed pumping, that changing circumstances during that time could either negate the need for or supply the additional water, and that only a portion of the water not withdrawn from the Aquifer pursuant to the

curtailment orders will ultimately reach the Spring Users. The Director rejected those arguments.

In the district court, the Groundwater Users argued that it would take an unreasonable amount of time to realize the anticipated benefits from the curtailment orders and during that time other factors could nullify the Spring Users' need for the water or ability to use it. The district court upheld the Director's decision, noting that the conjunctive management rules acknowledge that relief from curtailment will not be immediate.[6]

On appeal, the Groundwater Users contend that the delivery calls were futile because there "is no substantial evidence in the record that the additional 10 cfs that is expected to accrue to Blue Lakes over time, and the additional 2.67 cfs that is expected to accrue Clear Springs from curtailment over time, will enable either of them to produce more, larger or healthier fish." The Groundwater Users made this argument in the district court as showing a lack of evidence showing material injury, but there is no indication that they asserted it as showing the delivery calls were futile. This Court will not consider issues raised for the first time on appeal. *Parsons v. Mutual of Enumclaw Ins. Co.*, 143 Idaho 743, 746, 152 P.3d 614, 617 (2007).

**E. Did the District Court Err in Upholding the Director's Findings Based Upon the Ground Water Model?**

Former-Director Dreher relied upon the Department's ground water model in issuing the curtailment orders. However, he found that the model had an uncertainty of up to ten percent due to the margin of error in stream gauges used in developing the model. Based upon that level of possible uncertainty, he limited the junior water rights curtailed.

The hearing officer also relied upon the model when making his recommended findings. He reasoned: "There is no better science available. Decisions had to be made and will have to

---

[6] The district court quoted from IDAPA 37.03.11.020.04, which provides in part:

> The principle of the futile call applies to the distribution of water under these rules. Although a call may be denied under the futile call doctrine, these rules may require mitigation or staged or phased curtailment of a junior priority use if diversion and use of water by the holder of the junior-priority water right causes material injury, even though not immediately measurable, to the holder of a senior-priority surface or ground water right in instances where the hydrologic connection may be remote, the resource is large and no direct immediate relief would be achieved if the junior-priority water use was discontinued.

be made. The limitations of the model are identifiable and important but they do not preclude reliance upon it. It has an acceptable level of reliability based on peer reviewed science."

In their objections submitted to the Director, the Groundwater Users urged the Director to consider other uncertainties in the model. They argued that the Director should "assign a more accurate level of predictive uncertainty between 20 and 30%, and to constrict the trim line accordingly." The Director declined to do so. He held that the "ground water model represents the best available science for determining the effects of ground water diversions and surface water uses on the [Aquifer] and hydraulically-connected reaches of the Snake River and its tributaries" and that there "is no other technical basis as reliable as the simulations from the ESPA ground water model that can be used to determine the effects of ground water diversions and surface water uses on the ESPA and hydraulicaIy connected reaches of the Snake River and its tributaries." The Director also found that "the degree of uncertainty associated with application of the [Aquifer] ground water model is 10 percent."

The Groundwater Users asserted to the district court that the Director erred by failing to take into account known uncertainties in the model. The district court noted that "[t]here was testimony presented that the margin of error was probably much higher than 10% but that it had yet to be quantified by any scientific methodology." The court held that the evidence, although conflicting, "supports the use of the 10% margin of error as a minimum and is not arbitrary or capricious." The court added: "That is all that is available. No evidence was presented to establish a higher margin of error or to controvert that the margin of error is less than 10%."

On appeal, the Groundwater Users contend that the district court erred because "[t]he curtailment orders should be set aside because the Director failed to account for all known limitations of the [Aquifer] Model, resulting in a broader zone of curtailment than should have occurred." They argue that in addition to possible error from the stream gauges, "Model uncertainty also derives from non-uniform geology of the [Aquifer], variations within the Model cells, the assumption that well impacts are isotropic [the same in every direction], the assumption that all data was accurate and reliable, and the unaccounted for impacts of surface water diversions, precipitation recharge, and tributary underflow." They conclude by "ask[ing] the Court to set aside the curtailment orders and remand them to the Director with instructions to exercise his judgment in accounting for all contributing factors of Model uncertainty, and to re-define the area of curtailment accordingly."

33

The Groundwater Users do not specify which subsection of Idaho Code § 67-5279(3) permits their challenge to the Director's reliance upon the model. Because they argue that "[w]ith respect to limitations in the Model, the Director did not exercise his best judgment," we assume they contend that the Director abused his discretion in relying upon the ground water model. Idaho Code § 67-5279(3)(e). In determining whether an agency abused its discretion under that statute, we "must determine whether the agency perceived the issue in question as discretionary, acted within the outer limits of its discretion and consistently with the legal standards applicable to the available choices, and reached its own decision through an exercise of reason." *Haw v. Idaho State Bd. of Med.*, 143 Idaho 51, 54, 137 P.3d 438, 441 (2006).

There have been numerous studies of the geology of the Aquifer and ground water resources of the eastern Snake River Plain dating from 1902 to 1982, but none of them provide an adequate basis for the conjunctive management of water rights from surface and ground water sources. As a result, the Department contracted with the University of Idaho Water Resources Research Institute to develop a model. The model was calibrated to a twenty-two-year set of data from 1980 through 2002.

The hearing officer found that "[t]he limitations of the model are identifiable and important but they do not preclude reliance upon it. It has an acceptable level of reliability based on peer reviewed science." The Director adopted those findings, and found that the model "represents the best available science for determining the effects of ground water diversions and surface water uses on the [Aquifer] and hydraulically-connected reaches of the Snake River and its tributaries." He also found, "There currently is no other technical basis as reliable as the simulations from the [Aquifer] ground water model that can be used to determine the effects of ground water diversions and surface water uses on the [Aquifer] and hydraulically connected reaches of the Snake River and its tributaries." Those findings are not challenged on appeal. In fact, the Groundwater Users state, "The Model is the best science available for administering hydraulically connected surface and groundwater rights on the [Aquifer], but the Model is not perfect." They have failed to show that the Director abused his discretion in relying upon the model. He perceived the issue of utilizing the model as discretionary, he acted within the outer limits of his discretion and consistently with the legal standards applicable to the available choices, and he reached his decision through an exercise of reason. The district court did not err in upholding the Director's reliance upon the model.

34

**F. Did the District Court Err in Failing to Set Aside the Curtailment Orders Because the Director Did Not Give the Groundwater Users a Hearing Before Issuing the Curtailment Orders?**

Former-Director Dreher issued the curtailment orders without first giving the affected Groundwater Users a hearing. They raised that issue in the district court, and it did not directly address this issue.[7] It instead held that "the Director has abused his discretion and exceeded his authority by failing to hold a timely hearing on proposed mitigation plans and ordering replacement water without holding a timely hearing and failing to order curtailment after finding the mitigation plans inadequate . . . ." However, the court concluded that "there is no practical remedy at this point in these proceedings."

The Groundwater Users ask that the curtailment orders be set aside for the failure to grant them a hearing before the orders were issued. They argue, "Due process entitles property owners to 'an opportunity for a hearing before he is deprived of any significant property interest.'" (Quoting from *Fuentes* v. *Shevin,* 407 U.S. 67, 82 (1972).) Under Idaho law, a water right is real property, *Olson v. Idaho Dept. of Water Resources*, 105 Idaho 98, 101, 666 P.2d 188, 191 (1983); Idaho Code § 55-101, and the owner of a water right must be afforded due process of law before the right can be taken by the State, *Bennett v. Twin Falls North Side Land & Water Co.*, 27 Idaho 643, 651, 150 P. 336, 339 (1915). However, due process does not necessarily require a hearing before property is taken. *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 610-11 (1974); *Nettleton v. Higginson*, 98 Idaho 87, 92, 558 P.2d 1048, 1053 (1977). Even *Fuentes* acknowledged that there are circumstances that justify postponing notice and an opportunity for a hearing. It described three requirements that, if met, permit a prehearing seizure of property. They are as follows:

> First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official

---

[7] In this case, the Groundwater Users included in the record on appeal the briefs that they had submitted to the district court. Absent those briefs, the record would not show that they had submitted this issue to the district court, and we would not consider it on appeal. In addition, the record on appeal includes the agency record, which contains the briefs submitted by the Groundwater Users to the hearing officer and the Director.

> responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

407 U.S. at 91.

The first requirement is that "the seizure has been directly necessary to secure an important governmental or general public interest." A water right "does not constitute ownership of the water," *Joyce Livestock Co. v. United States*, 144 Idaho 1, 7, 156 P.3d 502, 508 (2007). All waters within the state when flowing in their natural channels and all ground waters are property of the State. Idaho Code §§ 42-101 & 42-226. The state has the duty to supervise their appropriation and allotment to those diverting such waters for any beneficial purpose. *Id*. "It is the unquestioned rule in this jurisdiction that priority of appropriation shall give the better right between those using the water. As between appropriators, the first in time is the first in right." *Beecher v. Cassia Creek Irr. Co.*, 66 Idaho 1, 9, 154 P.2d 507, 510 (1944). "The doctrine of prior appropriation grew out of the sense of justice of the miners who came to the west in search of gold and other precious metals." *Joyce Livestock*, 144 Idaho at 11, 156 P.3d at 512. "Eventually, the state, territorial, and federal governments recognized that the only way the arid lands of the west could be settled and turned to agricultural use was to officially recognize the law of appropriation as the law of the land." *Pocatello v. State*, 145 Idaho 497, 502, 180 P.3d 1048, 1053 (2008). Just apportionment to, and economical use by, those who have appropriated water for a beneficial use furthers the important governmental interest of securing the maximum use and benefit of Idaho's scarce water resources. *Nettleton v. Higginson*, 98 Idaho 87, 91, 558 P.2d 1048, 1052 (1977) ("[T]he entire water distribution system under Title 42 of the Idaho Code is to further the state policy of securing the maximum use and benefit of its water resources.").

The second requirement is that there has been a special need for very prompt action. In times of water shortage, someone is not going to receive water. When a junior appropriator wrongfully takes water that a senior appropriator is entitled to use, there is often the need for very prompt action. "Priority in time is an essential part of western water law and to diminish one's priority works an undeniable injury to that water right holder." *Jenkins v. State, Dept. of Water Resources*, 103 Idaho 384, 388, 647 P.2d 1256, 1260 (1982). Deprivation of water for the time it would take for a hearing may cause serious economic or other harm to the senior appropriator. In addition, very prompt action may be necessary to prevent attempts at self help and possibly even violence.

36

The third requirement is that the person initiating the seizure is a government official responsible for determining that seizure without a prior hearing was necessary and justified in the particular instance. That determination must be made under narrowly drawn standards. The State has the duty to supervise the appropriation and allotment of both surface and ground waters to those diverting such waters for any beneficial purpose. Idaho Code §§ 42-101 & 42-226. The State uses the Department and watermasters to allot the water among appropriators and to curtail junior appropriators who are interfering with the water rights of senior appropriators. They do so according to narrowly drawn standards.

Whether or not curtailment of water use can be ordered without prior notice or an opportunity for a hearing depends upon whether the three requirements are met under the circumstances of a particular delivery call or curtailment. *See Nettleton v. Higginson*, 98 Idaho 87, 92, 558 P.2d 1048, 1053 (1977) ("We find the above three requirements to be met in the *present case . . . .*"). (Emphasis added.) In the instant case, the record does not show that there was a special need for very prompt action without notice and an opportunity for a hearing. The groundwater pumping did not cause a sudden loss of water discharge from the springs. The flow from the springs at issue had been gradually declining over a number of years. Curtailment would not quickly restore the spring flows. The Director found that "[t]he effects of curtailment may be years to be realized." Under these circumstances, the Director abused his discretion by issuing the curtailment orders without prior notice to those affected and an opportunity for a hearing.

However, that does not invalidate the curtailment orders that are the subject of this appeal. The Groundwater Users were given notice and a hearing before the Director issued his final order, and it is that order which is the subject of this appeal. That they may have initially been denied due process with respect to the curtailment orders issued in May and July 2005 does not invalidate the final order issued in July 2008 after the hearing.

**G. Did the District Court Err in Failing to Order the Director to Curtail More Ground Water Pumping?**

After the hearing officer issued his recommendations, the Ground Water users filed objections with the Director contending, among other things, that the 10% margin of error should be disregarded because it was based upon the fact that the water gauges have a margin of error of

plus or minus 10% and there is no way to know whether the error is high or low. Thus, they argued that all water users of hydraulically connected water sources must be administered based upon priority. The Director did not accept that argument.

The Spring Users also raised the issue on their appeal to the district court. The court noted that former-Director Dreher's decision to exclude from administration water rights within margin of error was based in part upon the "full economic development" language in Idaho Code § 42-226. It also noted that the hearing officer upheld the prior Director's decision based upon the "public interest" considerations in Conjunctive Management Rule 020.03. In his final order, former-Director Tuthill adopted the findings of fact and conclusions of law of both Director Dreher and the hearing officer.

Director Dreher wrote as a conclusion of law, "'[W]hile the doctrine of "first in time is first in right" is recognized [and applies to ground water rights], a reasonable exercise of this right shall not block full economic development of underground water resources.' Idaho Code § 42-226." As explained above, that statute has no application to this case. The reference to "full economic development" in the statute refers to promoting full economic development of *underground* water resources by protecting a senior ground water appropriator only in the maintenance of reasonable pumping levels so that a senior appropriator with a shallow well could not block subsequent ground water appropriation. The Spring Users are surface water appropriators, not ground water appropriators.

The hearing officer upheld the prior Director's decision based upon the "public interest" considerations in Conjunctive Management Rule 020.03, and Director Tuthill accepted that analysis in his final order. That Rule includes the statement:

> The policy of reasonable use includes the concepts of priority in time and superiority in right being subject to conditions of reasonable use as the legislature may by law prescribe as provided in Article XV, Section 5, Idaho Constitution, optimum development of water resources in the public interest prescribed in Article XV, Section 7, Idaho Constitution, and full economic development as defined by Idaho law.

IDAPA 37.03.11.020.03.

The district court did not affirm the final order based upon the above-quoted statements regarding Idaho Code § 42-226 and Conjunctive Management Rule 020.03. The district court

held that "the Court concludes that the use of a trim-line for excluding juniors within the margin of error is acceptable simply based on the function and application of a model." The court stated, "The evidence also supports the position that the model must have a factor for uncertainty as it is only a simulation or prediction of reality. . . . Given the function and purpose of a model it would be inappropriate to apply the results independent of the assigned margin of error." The court concluded, "Accordingly, the Director did not abuse discretion by applying the 10% margin of error 'trim line.'" The issue is whether the district court erred in upholding the Director on the ground that he did not abuse his discretion in not curtailing ground water appropriators who are within the model's margin of error.

The Spring Users contend that the Director abused his discretion for several reasons. First, because the error in the stream gauges is plus or minus 10%, there is no way to know when administering water rights in a particular case whether the error is high or low. Second, the Director has described the groundwater model itself as the best available technology for determining the impact of junior ground water diversions on spring supplies. Third, there is no statute or administrative rule requiring 100% accuracy in measuring devices or in determining material injury, nor is there evidence showing that such level of accuracy could be achieved.

The Director concluded that there was up to a 10% margin of error in the groundwater model due to the margin of error in the stream gauges, and he decided not to curtail appropriators who were within that margin of error when deciding whether they were causing material injury to the Spring Users' water rights. The Director perceived the issue as discretionary, he acted within the outer limits of his discretion and consistently with the legal standards applicable to the available choices, and he reached his decision through an exercise of reason. The district court did not err in upholding the Director's decision in this regard.

In *American Falls Reservoir District No. 2 v. Idaho Department of Water Resources*, 143 Idaho 862, 878, 154 P.3d 433, 449 (2007), we stated, "Once the initial determination is made that material injury is occurring or will occur, the junior [appropriator] then bears the burden of proving that the call would be futile or to challenge, in some other constitutionally permissible way, the senior's call." The Spring Users argue that the Director's decision not to curtail appropriator's within the margin of error results in a shifting of the burden of proof from the junior appropriator to the senior appropriator. The Spring Users have not pointed to anything in

39

the record indicating that this argument was raised in the district court, so we will not consider it on appeal. *Houston v. Whittier*, 147 Idaho 900, 911, 216 P.3d 1272, 1283 (2009).

## IV.  CONCLUSION

We affirm the judgment of the district court.  Because all parties have prevailed in part, we do not award costs on appeal.

Justices BURDICK, J. JONES, HORTON and J. Pro Tem KIDWELL **CONCUR**.